067005

ORIGINAL

IN THE UNITED STATES
COURT OF FEDERAL CLAIMS

FILED
AUG 2 0 2007
U.S. COURT OF FEDERAL CLAIMS

BID PROTEST

AMERICAN DEFENSE SYSTEMS, INC.

Plaintiff,

v.

THE UNITED STATES OF AMERICA

Defendant.

Case No. 07-616 C

COMPLAINT

Plaintiff, American Defense Systems, Inc. ("ADSI"), brings this post-award bid protest action against Defendant, the United States of America, acting through the Department of the Navy, Naval Facilities Engineering Command, NAVFAC Southwest ("Defendant" or "the Navy"). ADSI respectfully seeks a temporary restraining order, preliminary injunction, and permanent injunction from the Court prohibiting any further contract performance by Southern California Gold Products ("SCGP") under a contract awarded to SCGP by the Navy pursuant to Solicitation No. N62473-07-R-4054. The Solicitation called for the procurement of 35 Construction and Material Equipment ("CME") kits to armor various items of construction equipment used by the Navy's Construction Battalions ("SeaBees") operating in combat areas. The CME kits provide both opaque and transparent (windshield) armor to protect the equipment operators from the effects of blasts such as those caused by Improvised Explosive Devices ("IEDS") in particular. The Solicitation was issued under the "urgent and compelling circumstances" authority of Federal Acquisition Regulation ("FAR") 6.302-2 to only ADSI and SCGP. ADSI was awarded a contract to supply 14 CME its, while SCGP was awarded a

contract for 21 CME kits. The procurement was conducted on a technically acceptable, lowest cost basis.

ADSI brings this action because NAVFAC has improperly awarded a contract for the 21 CME kits to SCGP which is not a presently responsible contractor, and because NAVFAC has accepted SCGP's proposal without determining whether the product offered by SCGP is "technically acceptable" to meet the requirements of the Solicitation to provide full and complete (360 degree) armoring protection for the entire vehicle and its operator/crew. ADSI asks the Court to order NAVFAC to terminate SCGP's contract and to award all remaining CME requirements to ADSI.

**Jurisdiction**

1. This Court has jurisdiction over this matter under 28 U.S.C. 1491 (b).

**Parties**

2. ADSI is a corporation organized under the laws of the State of Delaware with its principal place of business at 230 Duffy Avenue, Unit C, Hicksville, New York 11801.

3. Defendant is the United States of America, acting through the Naval Facilities Engineering Command, NAVFAC Southwest, Specialty Center Contracts Core, Code RAQN0/Naval Base Ventura County, 1205 Mill Road, Building 850, Port Hueneme, California 93043-4347.

**Facts**

4. ADSI is a preeminent supplier of add-on armor kits to armor military construction vehicles and equipment such as dozers, scrapers, mixers, and cranes. The add-on armor kits (or, as here, CME kits) consist of both opaque armor (composite, composite on steel, or steel on steel plating) to protect the top, sides, and bottom of the equipment as well as transparent armor for

windshields. A critical element is the proper welding or bolting of the armor to the vehicles; otherwise, the armor may fail when impacted or the welds/bolts may themselves become lethal shrapnel. ADSI has developed unique and proprietary solutions to these attachment requirements.

5. SCGP had been a subcontractor to ADSI and had never previously produced add-on armor kits. SCGP has subsequently become a direct competitor to ADSI, and ADSI believes that SCGP has misappropriated ADSI's proprietary and confidential information in order to compete against ADSI for add-on armor contracts. ADSI has filed a lawsuit against SCGP in the federal district court for the eastern district of New York for conversion, misappropriation, and breach of contract ("the New York Complaint"). See Exhibit A hereto.

6. It has been a consistent requirement for these add-on armor contracts until the instant procurement that the offerors' kits have been tested at the military's Aberdeen Test Center ("ATC"). ADSI's kits have been successfully tested. SCGP's kits have never been successfully tested.

7. In May, 2007, the Navy conducted a procurement for CME kits under Solicitation No. N62473-07-R-4024 ("-4024") in which SCGP was the apparent successful offeror and received a contract award. Solicitation -4024 contained an express ATC testing requirement. ADSI protested the award at the Government Accountability Office ("GAO") on the grounds that SCGP's kits had never passed ATC testing and, therefore, that SCGP was not a qualified offeror.

8. On June 18, the Navy terminated SCGP's contract under -4024 for convenience on the basis that there had been irregularities in the procurement process. The exact reasons for the termination action remain unknown.

9. Solicitation no. N62473-07-R-4054 ("-4054") which is the subject of this current complaint before the Court was issued by the Navy on June 4 under the "urgent and compelling" circumstances exception to the requirement of the Competition In Contracting Act for full and open competition. FAR 6.302-2.

10. Solicitation -4054 did not contain an ATC testing requirement. It provided only a one day turn-around time for the submission of offers to supply 35 CME kits for various military construction equipment items. For that reason, among others, ADSI did not have an opportunity to challenge the omission of the ATC testing requirement.

11. Solicitation -4054 provided that the Navy could make multiple awards and further stated that award would be on the basis of the technically acceptable, lowest cost offer for each of the 35 CME items.

12. On June 7, the Navy awarded 14 CME kits to ADSI and 21 to SCGP at respective total prices of $843,122.06 and $988,000.00. All CME kits are to be delivered within 75 days from the date of contract award.

13. On June 11, ADSI protested the contract award to SCGP for the 21 CME kits in a new GAO action. Because of the urgency of the requirement, the protest was handled by GAO on an expedited basis. ADSI alleged that SCGP was not a qualified offeror because its add-on armor product had never been tested; because it had never previously provided add-on armor kits under any prime contract; and because whatever acceptable technology it might now have was misappropriated from ADSI. See Exhibit B.

14. The Navy filed a report on June 21 in which it argued that certain protest issues were untimely and further advised GAO of its determination that SCGP was a qualified offeror for this procurement which, the Navy noted, did not require ATC testing. The Navy claimed that while

SCGP's solution had not been ATC- tested, the armor plating material called for in Solicitation -4054 in fact had been tested. In other words, the steel, composite, etc. plating materials had been tested, not the manner by which SCGP would attach the armor to the vehicles. The Navy also claimed that SCGP had performed successfully under at least one other contract. See Exhibit C.

15. On July 6, GAO dismissed ADSI's protest, essentially agreeing with the Navy's position, finding that any challenge to the omission of the ATC testing requirement was untimely and that the question of SCGP's ability to perform was a matter of responsibility generally beyond GAO's bid protest jurisdiction. See Exhibit D. The instant action before this Court now follows.

**COUNT I**
**SCGP Is Not a Responsible Contractor**

16. ADSI hereby incorporates paragraphs 1-15 as if stated in full text herein.

17. The FAR 9.103 requires that contract awards be made only to contractors who meet the indicia of present responsibility; that is, to firms which have the technical and financial resources to meet all contractual requirements or the ability to obtain those resources. FAR 9.104-1.

18. SCGP cannot meet the requirements of the contract it received under Solicitation -4054 because it has never previously furnished add-on armor kits under a Government prime contract. The Navy has no basis to know whether SCGP has the technical capability to produce and supply CME kits that will provide the necessary level of blast protection contemplated by Solicitation -4054. By omitting the requirement for ATC testing, the Navy then had to take other steps, which it did not take, to properly determine if in fact SCGP produces a product with the same or similar level of capability and sophistication as the CME kits available from ADSI, particularly with regard to the proper welding or bolting of the armor to the vehicles.

19. In addition, SCGP is not a responsible contractor because it lacks the necessary and appropriate history of business ethics and integrity also demanded by FAR 9.104-1 (d).

20. As alleged in its New York Complaint, ADSI believes that SCGP has only been able to enter the add-on armor kit market and become a direct competitor to ADSI through the misappropriation of ADSI's confidential and proprietary technical data and information during the time SCGP was a subcontractor to ADSI.

21. ADSI's charges against SCGP were known to the Navy at the time it awarded a contract for the 21 CME kits to SCGP as the Navy acknowledged in its June 21 report to GAO. See Exhibit C, at 5.

22. In the face of this knowledge, and given the lack of any showing that SCGP has in fact previously delivered acceptable add-on armor kits to the military under other contracts, the Navy acted improperly in determining SCGP to be a presently responsible contractor by awarding it a contract for the 21 CME kits in question.

**COUNT II**
**The Navy Did Not Properly Evaluate SCGP's Offer**

23. ADSI incorporates paragraphs 1-22 as if stated in full text herein.

24. By omitting the prior Solicitation -4024's requirement for ATC testing, the Navy deprived itself of the means to verify if SCGP's product would work in a combat situation and satisfactorily protect the lives of the troops operating construction equipment in that environment.

25. Therefore, even though Solicitation -4054 only called for the submission of technically "acceptable" proposals and did not provide for an in-depth technical evaluation, absent the validation and verification that would have been provided by ATC testing, the Navy had no way of determining whether SCGP's product was in fact technically acceptable.

26. While it appears that SCGP has delivered 12 of the 21 CME kits it has been contracted to supply to date, there is no confirmation that the kits meet the requirements of the Solicitation.

27. The Navy simply did nothing to establish that the 21 CME kits SCGP has been contracted to supply will provide the necessary protection to the operators of the construction equipment to which the CME kits will be attached. The Navy acted unreasonably in accepting SCGP's offer merely on the strength of the fact that SCGP agreed to supply the kits under the terms of Solicitation -4054 and took no exceptions. See Exhibit C, at 5.

**WHEREFORE, PLAINTIFF**, American Defense Systems, Inc. prays that this Court sustain this protest on both grounds and provide the following declaratory and injunctive relief:

a. Permanently enjoin SCGP from any further performance under its contract for the 21 CME kits;

b. Order the Navy to award to ADSI all remaining CME kits out of the 21 awarded originally to SCGP;

c. Order the Navy not to conduct any future CME kit competitions unless the solicitation provides a requirement that every offeror's product has been successfully tested by ATC.

d. Declare ADSI entitled to its damages, including, but not limited to, its bid and proposal preparation costs.

e. Award ADSI its costs and attorneys' fees incurred in this action; and

f. Grant such other and further relief as this Court deems just and proper to afford ADSI a complete remedy.

Dated: August 20, 2007

Respectfully submitted,

Richard L. Moorhouse
GREENBERG TRAURIG, LLP
1750 Tysons Boulevard.
Suite 1200
McLean, Virginia 22101
Tel.: (703)749-1311
Fax: (703)714-8308
E-mail: moorhouser@gtlaw.com

Of Counsel:
L. James D'Agostino
David T. Hickey
Sean M. Connolly
GREENBERG TRAURIG, LLP
1750 Tysons Boulevard
Suite 1200
McLean, Virginia 22101
Tel.: (703)749-1300
Fax: (703)749-1301

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

CV-07 2779

AMERICAN DEFENSE SYSTEMS, INC.

Plaintiff,

v.

SOUTHERN CALIFORNIA GOLD PRODUCTS, INC. d/b/a GYPSY RACK; GLENN WALKER HARRIS; JAMES MCAVOY

Defendants.

FEUERSTEIN, J.

Civil Action No.

FILED IN CLERK'S OFFICE U.S. DISTRICT COURT E.D.N.Y. ★ JUL 2007 ★ BROOKLYN OFFICE

COMPLAINT

TOMLINSON, M.J.

JURY TRIAL DEMANDED

## THE PARTIES AND THEIR BUSINESSES

1. American Defense Systems, Inc. ("Plaintiff" or "American Defense") is a Delaware Corporation headquartered in New York and a world leader in the design, manufacture, and installation of transparent and opaque glass-armor proprietary inventions, including full security door, windows and vehicle armorization kits and systems. American Defense specializes in transforming its engineer's proprietary designs into innovative, functional security glass-armor applications for the physical security industry, including the United States armed forces.

2. American Defense glass-armor security applications and kits can be found in corrective facilities, court buildings, multiple locations involving national security (American Defense glass armor was utilized to protect President Bush at his Presidential Inauguration), and in the combat theatre, including protecting American troops operating in harms' way in Iraq, as well as in office buildings throughout the United States and the world.

3. The foregoing, *inter alia*, positions American Defense as a global leader and innovator in the proprietary designing, systems integration, manufacture and installation of comprehensive transparent and opaque armor crew protection kits (hereinafter "CPK"), which include glass, glass frames, and design solutions for military vehicles and construction equipment as well as government and private buildings and facilities.

4. Additionally, American Defense' multiple state-of-the-art **UTILITY** patent pending bullet and blast resistant designs and products have consistently proven their exceptional reliability under rigorous proprietary testing conditions (both private and governmental) in support of military operations and reconstruction projects threatened by IEDs, rocket attacks, and hostile elements (the words "UTILITY" and "UTILITIES" are emphasized herein to distinguish from the design patents owned by Defendants that have nothing to do with bullet proof glass and armor solutions). The Defendant's DESIGN patents merely protect vehicle carrying-type racks, such as roof racks, brush racks, and other carrying racks.

5. American Defense has not added a patent infringement cause of action against Defendants in this case as its patent applications are still pending and unpublished, and thus not able to be enforced, as of this date.

6. To date, ADSI has pledged an uncompromising commitment to "protecting the protectors" and has supplied a wide-ranging assortment of protective packages to U.S. military assets deployed in harm's way, federal agencies involved in the war on terrorism, as well as private facilities with a vision toward protecting them from terrorism.

7. In acknowledgement of American Defenses' commitment to excellence, The U.S. Small Business Administration recently selected American Defense as the 2007 Region II Prime Contractor of the Year. American Defense has spent many years of time and substantial sums of

money to secure and maintain its information as formal intellectual property that is considered proprietary and confidential (and sometimes trade secret in nature) and also in the form of multiple patent applications (that are not presently published nor approved) that cover some of the very proprietary and confidential materials that are the subject of this lawsuit. Other American Defense proprietary and confidential information are maintained as methods, know-how, test results, process data, customer and sub-contractor lists, and other information.

8. American Defense also has common law copyrights in all of its product designs, some of which can be viewed at. http://www.americandefensesystems.net/ **[Exhibit 1]** (please click link to "The ADSI Photo & Video Gallery" to view American Defense products in use).

9. Southern California Gold Products, a/k/a 'Gypsy Rack' and related party Defendants Glenn Walker Harris and James McAvoy (hereinafter collectively or singularly "Defendants", "California Gold Products", "Gypsy Rack", "Harris" and/or "McAvoy") are a California corporation and individuals located and residing in California. Gypsy Rack is operated by Co-Defendant Glenn Walker Harris. Co-Defendant James McAvoy is affiliated with Gypsy Rack, and has aided Gypsy Rack in committing acts that have harmed American Defense as more fully set forth hereinafter.

10. Gypsy Rack, in the course of its recent business, has solicited, and in fact contracted to sell proprietary and inappropriately acquired American Defense custom armor conversion kits for construction and material equipment vehicles (*e.g.* scrapers, loaders and bulldozers and similar equipment) and other military vehicles using the custom UTILITY designs that are intended to be used by U.S. soldiers in combat through the United States Navy. On information and belief, American Defense believes that the Gypsy Rack materials solicited and presently

being supplied to the Navy are sub-par, as they have not been rigorously tested for performance, as the genuine American Defense materials have been.

11. Upon information and belief, prior to a commercial relationship with American Defense, the Defendants never engaged in the business of selling custom armor conversion kits for any vehicles or facilities, and never made attempts to supply such custom armor conversion kits to the U.S. military or otherwise, but merely sold HUMVEE decorative and semi-functional accessories, including grill and bush racks, vehicle roof storage racks, and back-end vehicle customization kits, such as gas can racks. Several Gypsy Rack products are the subject of U.S. design patents, such as the design for the semi-functional vehicle roof rack **[Exhibit 2** serves as an illustrative example of one of several issued Gypsy Rack decorative DESIGN Patents].

12. Upon information and belief, the Defendants through Gypsy Rack now offer to sell and are selling or attempting to sell custom proprietary and inappropriately acquired armor conversion kits for military solicitations which sales and attempts to sell began only after the Defendants' collaborative contractual relationship with American Defense (which was covered under a **Non-Disclosure and Non-Compete Agreement** signed in June of 2005 (hereinafter the "Agreement") **[Exhibit 3]).** Upon further information and belief, the Defendants are attempting to utilize proprietary and inappropriately acquired American Defense subcontractor relationships to solicit and perform such military contracts, and thus also breaching the non-compete clauses in the Agreement.

13. American Defense was compelled to file this lawsuit to end, upon information and belief, Defendants' massive, ongoing activity, including, but not limited to the sale of the armor, the conversion of electronic and web site information, as well as the use of American Defense's name or form thereof that have wronged American Defense and threatened future contractual

arrangements and relationships with the United States Marines and United States Navy that American Defense has invested enormous and substantial amounts of time and money and other investor resources to develop, and to recover damages for the harm caused by Defendant's wrongful activities.

14. By using American Defense's confidential and proprietary information for armor conversion kits to gain lucrative contracts, by using misleading web site information, and by engaging in non-compete tactics, among other things, Gypsy Rack has encroached directly on American Defense's legitimate business interests, undermined American Defense' ability to market, sell and distribute their comprehensive up-armor conversion kits which include proprietary and lawfully gained glass and opaque armor component designs, proprietary combat locks and proprietary egress windows. By wrongly using American Defense's confidential and proprietary information , through unlawful, illegitimate means, Defendants have interfered with and jeopardized valuable American Defense business relationships, such as with the U.S. Navy and others that purchase American Defense products.

15. Not surprisingly, American Defense products have proven to be a huge success.

16. Gypsy Rack's entire construction and material equipment armor business, however, amounts to nothing more than a massive piggy backing on American Defense' good will, UTILITIES, confidential and proprietary information, trade secrets, and relationships, in violation of American Defense' rights under U.S. and New York State law.

17. American Defense is entitled to preliminary and permanent injunctive relief to stop Gypsy Rack's brazen violation of Plaintiffs' rights. American Defense is further entitled to damages and injunction, as detailed below.

18. American Defense and Gypsy Rack mutually collaborated as sub-contractors under the Agreement, and agreed to the confidentiality and proprietary nature of the information supplied by American Defense to Defendants and non-competition provisions **[Exhibit 3]**.

19. American Defense and Gypsy Rack are presently in the process of arbitrating the sole issue of the final amount of money owed between the parties under the work performed and that which Gypsy Rack failed to perform within the purview of the Agreement.

## NATURE OF THE ACTION

20. This is a civil action based on U.S. and New York State causes of action brought by American Defense seeking equitable and legal relief and damages for unfair competition, misappropriation of trade secrets and confidential information, passing off and false advertising under § 43 of the Trademark Act of 1946 ("Lanham Act") (15 U.S.C. §1125 et seq.), misuse of proprietary and confidential information, including but not limited to electronic information published over the internet to gain at least one U.S. contract, and for New York state common-law breach of contract (*inter alia* confidentiality, non-compete), unfair competition, trade secret/confidential information misappropriation, conversion, common law copyright, tortuous interference with ADSI business expectancy and contract, unjust enrichment, misrepresentation of business relationships under New York State law with respect to American Defense confidential information and materials wrongfully taken and utilized by the Defendants.

21. American Defense seeks a declaration that Gypsy Rack's actions willfully constitute unfair competition, misappropriation and are deceptive under Federal and New York law. Plaintiffs further seek an injunction prohibiting Gypsy Rack from further use of American Defense proprietary and confidential information as a source of information to bid on federal

defense contracts. American Defense also seek statutory or actual damages for willful use of it's proprietary and confidential information and competing in violation of the Agreement in the maximum amounts allowed by the law, as well as compensatory and punitive damages, and an accounting, a constructive trust, and disgorgement to remedy Defendant's violations of New York state law.

## JURISDICTION AND VENUE

22. The Court has subject matter jurisdiction over this matter pursuant to diversity of citizenship and the Lanham Act claims under 28 U.S.C. §§ 1331 and 1338(a), and over the state-law claims pursuant to 28 U.S.C. §§ 1338(b) and 1367(a).

23. The United States District Court for the Eastern District of New York has personal jurisdiction over Defendants under New York State Civil Practice Law and Rules Sections 302(a) 1 and 3. Defendants regularly transacted business in New York and contracted to supply goods and services in New York. Defendant's conduct has caused and continues to cause injury to American Defense in New York. Defendant expects or should reasonably expect its wrongful activities to cause injury within New York State and have consequences to American Defense in New York. Defendants affirmatively choose to derive substantial revenue from international and interstate commerce and, upon information and belief, regularly do or solicit business and derive substantial revenue from goods used or services rendered in New York State. Moreover, Defendants maintained a continuous and on-going commercial relationship with American Defense in New York.

24. Defendant's internet domain names are an integral part of Defendant's brand and are essential to Defendant's infringing on American Defense's business. For example, see http://www.gypsyrack.com/ **[Exhibit 4]** were Gypsy Rack nationally advertises "Custom Up-

Armor services" and claims to have "worked closely with TACOM", both statements negatively impacting American Defense and forming part of the American Defense federal and state complaints. American Defense submits that Defendants, by virtue of their federal activities that have negatively impacted American Defense in New York, the Defendants have further submitted themselves to personal jurisdiction. For another example of Defendants' federal presence, see http://www.calgoldproducts.com/ **[Exhibit 5]**, where Defendants have advertised "custom conversion kits" for military vehicles that have had a further damaging effect on American Defense in New York and nationally, based on the Defendants' competing with American Defense, soliciting military contracts to supply HUMVEE customizing kits, which continues to damage American Defense in New York.

25. Venue is proper in this District pursuant to 28 U.S.C. § 1391(d) and §§ 1391(b) and (c).

**COUNT ONE**

(Violation of the § 43 of the Trademark Act of 1946 ("Lanham Act") (15 U.S.C. §1125 et seq.)

26. American Defense incorporates by reference paragraphs 1 – 25 of this complaint as if set forth herein at length.

27. Through their actions and conduct, including bidding on federal government contracts, Defendants, without the consent or approval of American Defense, are engaging in the promotion of sub-standard goods and services, including, but not limited to, those misappropriated American Defense UTILITIES, materials, devices and qualities, subcontractors information, and engaging in deception and passing off as to the qualities of those goods and services, as well as American Defense's name and are damaging to American Defense.

28. Defendant's domain names are of an integral part of Defendant's brand and are essential to Defendant's deceptive business practices and conduct. http://www.gypsyrack.com/ **[Exhibit 4]** and http://www.calgoldproducts.com/; **[Exhibit 5]**.

29. Upon information and belief, Defendants have wrongly and falsely made and continue to wrongly and falsely make claims as to their affiliation with the U.S. Army's Tank and Automotive Command (hereinafter "TACOM"), and other U.S. armed forces commands in order to secure contracts for custom armor packages for military vehicles, including, but not limited to custom armor conversion kits. American Defense has a legitimate on going affiliation with TACOM and has had such affiliation since long before the Agreement with Southern California Gold. This deceptive and false claiming was based on the sub-contracting work that Defendants had done with and for American Defense under the Agreement. In truth, upon information and belief, Defendants have never worked with TACOM on any armor contract and by intimating as much, have caused confusion as to their affiliation with American Defense, and have wrongly benefited through such affiliation.

30. Upon information and belief, Defendants have wrongly and falsely made claims a0000000000000000000000000000000000nd continue to wrongly and falsely make claims that "their" glass armor solutions had been tested and approved at the Aberdeen Proving Grounds (hereinafter "APG") in Aberdeen MD or anywhere else. They have not submitted any glass or opaque armor for testing to APG directly. The claim is based on their deceptive proffer that legitimate glass and opaque armor test results of American Defense glass and opaque armor applies to Defendants as well, with resulting confusion and a contract being awarded based on such an assertion.

31. At the Marine West trade show held recently, persons associated with Defendants took photographs of American Defense hardware and glass armor solutions that were displayed by American Defense at the Plaintiff's trade booth. As taking these photographs was prohibited at this trade shows, trade show organizers forced these individuals to delete the digital images from their camera.

32. Defendants displayed photographs of American Defense hardware and glass armor solutions on their website and presented them as original Defendant designs. American Defense has forced Defendants to remove these photos as a violation of American defense common law copyrights. Text related to the photographs is still available on the Southern California Gold Products, Inc. website, and American Defense is in the process of filing federal copyright registrations on sketches, schematics, designs, and other ideas as an alternative federal cause of action to this complaint.

33. Such acts constitute a violation of American Defense's proprietary and confidential information and exclusive rights under the Lanham Act in violation of 15 U.S.C. §1125.

**COUNT TWO**

(New York State Misappropriation of Trade Secrets and/or Confidential Information)

34. American Defense incorporates by reference paragraphs 1 – 33 of this complaint as if set forth herein at length.

35. Defendants Glenn Walker Harris ("Harris") and James McAvoy ("McAvoy") are individuals and agents of Defendants California Gold Products and Gypsy Rack. Under the Non-Disclosure and Non-Compete Agreement **[Exhibit 3]**, Harris and McAvoy worked in conjunction with American Defense, and were allowed to have intimate and trusted contact with American Defense confidential information and materials, including, but not limited to materials

specifications and customer lists. Upon information and belief, McAvoy continues to work in conjunction with Harris, California Gold Products and Gypsy Rack. While McAvoy was acting within the course and scope of the Agreement with American Defense, Defendants Harris and McAvoy were allowed access to vital American Defense information, including, but not limited to, the results of experiments which show not only successful embodiments of the American Defense products, but unsuccessful results. A current physical embodiment of this information is American Defense's proprietary process for making glass and opaque armor. Gypsy Rack is now in possession of that physical embodiment, and refuses to return the material. All of the information relating to this process and to its development is referred to herein as the "American Defense Trade Secrets and Confidential Information".

36. In building its business within the glass and opaque armor industry, American Defense has developed and maintained information about its customers and potential customers (including the U.S. Marines and U.S. Navy), and including their special needs and preferences relating to American Defense products as well as American Defense's long established and continuing collection and analysis of its private marketing, administrative, financial, manufacturing and research data which is generated by its various business units. All of the information relating to the Marketing Plans and Business Plans, and the data which underlie them, is referred to herein as the "American Defense Business Trade Secrets and Proprietary Information". The American Defense Trade Secrets and Confidential Information and the American Defense Business Trade Secrets and Proprietary Information, and technical and marketing information are not generally known, and are maintained in confidence by the American Defense employees and others who need to know them but who are entrusted with them according to express and implied agreements.

37. American Defense has at all times taken reasonable steps to protect such confidential information from being stolen and misused. In fact, this information would be of great value if it became known to American Defense's competitors, including the Defendants.

38. Harris and McAvoy, in their positions at California Gold Products and Gypsy Rack had and gained access to the American Defense Trade Secrets and Confidential Information and the American Defense Business Trade Secrets and Proprietary Information, technical and business trade secrets and proprietary information. As a result, they knew and do know virtually all of American Defense's most sensitive trade secrets and proprietary information. Without the information obtained from American Defense, California Gold Products and Gypsy Rack, Harris and McAvoy would be unable to sell or to perform any functions or services, including bidding on a recent Navy solicitation and glass armoring of military vehicles [although **Exhibit 4** would lead one to believe otherwise] without using the information illicitly and wrongfully gained from American Defense.

## <u>COUNT THREE</u>

(Breach of Contract and Unjust Enrichment)

39. American Defense incorporates by reference paragraphs 1 – 38 of this complaint as if set forth herein at length.

40. In June of 2005, Defendant Southern California Gold Products, Inc., a/k/a/ Gypsy Rack contracted with American Defense under the Non-Disclosure and Non-Compete Agreement **[Exhibit 3]** ("the Agreement").

41. In violation of certain aspects of the Agreement, upon information and belief, Defendants approached an American Defense vendor for air conditioning equipment (Red Dot, Seattle WA) with intent to purchase AC kits used with American Defense armored Crew Protection Kits

("CPKs"). Red Dot subsequently sold Defendants several kits before realizing that American Defense had paid for the engineering and development of those kits. Red Dot has ceased selling to Defendants.

42. In violation of certain aspects of the Agreement, Defendants approached an American Defense vendor for insulation [Michigan Rubber & Gasket, Warren MI (hereinafter "MRG")] with intent to purchase insulation kits used with American Defense armored CPKs. MRG did not sell the kits but did sell raw materials to Defendants.

43. As a result of Defendant's multiple breaches of contract, they were able to compete for, and gain a substantial government (Navy) contract, and thus become unjustly enriched as a result of their wrongful violations.

**COUNT FOUR**

(Tortuous Interference with Prospective Economic Advantage)

44. American Defense incorporates by reference paragraphs 1 – 43 of this complaint as if set forth herein at length.

45. American Defense has fulfilled a series of glass armor contracts with both the U.S. Marines and the U.S. Navy. In the instant case, American Defense and Defendants both bid on a U.S. Navy solicitation [presently confidential], and the Defendants not only bid in violation of the non-compete potions of the Agreement, but further used [false] information gained, upon information and belief, through its relationship with American Defense to secure said bid. Upon protest of the bid by American Defense, the bid was negated. The re-bid is presently being solicited.

46. Through a series of misleading publicly-available statements and deceptive representations, the Defendants intentionally induced the U.S. Navy and American Defense to disrupt a formerly positive relationship with great financial value to American Defense.

**COUNT FIVE**

(Conversion)

47. American Defense incorporates by reference paragraphs 1 – 46 of this complaint as if fully set forth herein at length.

48. Defendants had access to and retain the American Defense Trade Secrets and Confidential Information and the American Defense Trade Secrets and Proprietary Information, name and web site information.

49. Defendants have converted the foregoing for their own use and financial gain.

50. By virtue of said conversation, American Defense has been damaged.

**COUNT SIX**

(Conspiracy)

51. American Defense incorporates by reference paragraphs 1 – 50 of this complaint as if fully set forth herein at length.

52. Upon information and belief, the Defendants intentionally conspire and have conspired together in electronic and non-electronic mediums and maliciously and willfully entered into a scheme to misappropriate the UTILITIES and American Defense Trade Secrets and Confidential Information and American Defense Trade Secrets and Proprietary Information, name and web site information and deceptively use the same for their own economic advantage and thereby deprive American Defense of its economic advantage and financial gain which American Defense had prior to placing said conspiracy into motion.

53. Upon information and belief, in pursuance of such conspiracy, the Defendants undertook and continue to undertake the acts and conduct as complained of herein and all of such acts and conduct was participated in and done by all the Defendants or by one or more of them as according to the plan of such conspiracy and for the purpose of defrauding and deceiving American Defense and third parties for the purpose of their own economic advantage and financial gain.

54. By virtue of said conspiracy, American Defense has been damaged, including, but not limited to, American Defense's prior economic advantage, financial gain and contractual strength with the U.S. armed forces and the public as well as damage to American Defense's reputation, goodwill and product integrity.

**JURY DEMAND**

55. Plaintiff hereby demands a jury trial.

WHEREFORE, Plaintiff American Defense prays for judgment against Defendants as follows:

(a) For an injunction to enjoin Defendants from deceptively bidding and/or securing military contracts in competition with other military vendors relating to glass armor solutions, as they have wrongly gained their right to do so through the use of American Defense UTILITIES, American Defense Trade Secrets and Confidential Information and American Defense Trade Secrets and Proprietary Information, do not perform proper work through tested and approved products, and thus further place our foreign troops in harms way;

(b) For a declaration that Defendants, both directly and secondarily, willfully violated Plaintiffs' rights, have engaged, and are engaging in violations of federal and New York State laws, including, but not limited to American Defense's rights under the Lanham Act;

(c) For compensatory in the amount of $5,525,000;

(d) For punitive damages in amounts to be determined upon the trial of this action;

(e) For an accounting, restitution and disgorgement of any Defendants' unlawful proceeds and benefits obtained by its misappropriation and unfair competition;

(f) For all of American Defense's tangible and intangible assets to be returned to American defense;

(g) For American Defense's costs to bring this action, including reasonable attorneys' fees, pursuant to 17 U.S.C. § 505 and otherwise;

(h) For prejudgment and post-judgment interest; and

(i) For such other relief as the Court may deem just and proper.

Dated: July 9, 2007

Respectfully submitted,

Gerard Amalfitano, Esq. (GA7202)
254 South Main Street
Suite 517-Fifth Floor
New York City, New York 10956
Tel: (845) 708-1235
Fax: (845) 708-8727
ga1000@verizon.net

Duane Blake, Esq., of Counsel
Application Pro Hac Vice Admission
to be filed

*Counsel for Plaintiff American Defense Systems, Inc*




## Media Coverage & Upcoming Events

**NDIA Live Fire Test & Evaluation Conference**
June 25-28
**NDIA Defense Acquisition Management Course**
July 15-19
**IED 2007**
June 11-13
**BuildingsNY 2007**
June 27-28
**DSEi 2007**
September 11-14
**ASIS International 2007**
September 24-27
**Modern Day Marine 2007**
October 2-4

▶Click Here for Details

**ISC East 2007**
**Register Free Today!**
September 11-12 | New York

**April 13, 2007—Hicksville, New York:** General James T. Conway, the 34th Commandant of the United States Marine Corps, and Lieutenant -General James F. Amos, the U.S. Marine Corps' Deputy Commandant for Combat Development and Integration, visited American Defense Systems, Inc. (ADSI) on April 13, 2007. The visit and inspection occurred at the ADSI corporate headquarters located in Hicksville, NY.



*Chief Executive Officer Tony Piscitelli presents CMC General James T. Conway with a commemorative 9/11 American flag.*

General Conway and Lieutenant General Amos inspected a United States Marine Corps (USMC) "TRAM" (Tractor, Rubber-tired, Articulated steering, Multi-purpose vehicle) fitted with an ADSI armored Crew Protection Kit (CPK). ADSI managers and engineers briefed the Generals concerning the CPK's bullet and blast protective capabilities provided by the comprehensive armor solution. These designs incorporate sophisticated protective features including ADSI's transparent and opaque armor systems, innovative egress windows, crew comfort systems and combat locks. The Marine generals were also briefed on ADSI's unique glass cutting saw. The tour concluded with a discussion of ADSI's continuing development and rapid deployment of its revolutionary designs and technologies to protect America's war fighters and nation-builders. "Our sole mission is to protect Marines and to keep them safe," ADSI CEO and Chairman Anthony J. Piscitelli explained, "and our glass and armor has done that for our Marines, soldiers, airmen and sailors in Iraq and Afghanistan." Mr. Piscitelli proudly briefed the Marine Corps commandant on a USMC TRAM that had been hit by an insurgent device in Iraq, but kept its operator safe. The Marine inside the ADSI Crew Protection Kit, walked away without a scratch.



*Chief Executive Officer Tony Piscitelli and Vice President of Research Vic LaSala brief CMC General Conway on an armored TRAM door highlighting ADSI composite solutions.*

General Conway seemed genuinely impressed by ADSI's active dedication in the support of the U.S. military's global missions. He expressed his thanks to the men and women who work at the facility for their dedication to making sure that the Marines serving in harm's way were protected from enemy threats.

ADSI is one of the world's leading innovators in the design, manufacture and installation of comprehensive transparent and opaque armor crew protection kits (CPK) for military vehicles and construction equipment. ADSI's state-of-the-art bullet and blast resistant designs and products are used in a variety of architectural applications via customized security doors, windows and curtain wall systems.



*CMC General Conway addresses the ADSI team in our Hicksville headquarters.*

ADSI products and designs have consistently proven their exceptional reliability in support of military operations and reconstruction projects. ADSI products continue to prove their value in areas of the world where assets are threatened by IEDs, rocket attacks, and hostile elements.

## OTHER NEWS

**U.S. Small Business Administration Awards American Defense Systems, Inc. as the 2007 "Prime Contractor of the Year for Region II"**
The U.S. Small Business Administration announced that it has selected American Defense Systems, Inc. (ADSI) of Hicksville, New York, as the 2007 Region II Prime Contractor of the Year. (Continued...)

**Up Armor Team saves lives of fellow logistics Marines**
During the war in Iraq , one thing has proven to be true: up-armor saves lives. That is why the Marines with the Up-Armor Team of Engineer Ordnance Platoon, Maintenance Company, 2nd Maintenance Battalion, 2nd Marine Logistics Group (Forward), know the importance of their job. (Continued...)

## ABOUT ADSI

**Mission Statement**
As a world leader in the design, manufacture, and installation of transparent and opaque armor, security door, windows and curtain wall systems, American Defense Systems, Inc. transforms the Architect's & Engineers designs into innovative, functional and esthetically pleasing security applications for the physical security industry.

We protect and serve those who defend, serve and protect us with an uncompromising commitment to safety and excellence in product design and installation.

We bring value, integrity, and experience, to our business partners, and our customers.

**Why is ADSI different?**
Our in-house design and engineering capabilities enable us to be more responsive to tight timeframes than anyone else in the industry. We have an unrivalled record of delivering top-quality, tested and proven design solutions in just a fraction of the time taken by our competition.

We are praised by our clients for our conceptual and intellectual capabilities in this ever-changing

world. We have a proven ability to adapt our designs and products to respond to the protection requirements you may have.

US00D540736S

(12) **United States Design Patent** (10) **Patent No.:** **US D540,736 S**
(45) **Date of Patent:** ** **Apr. 17, 2007**

**Harris**

(54) **ROOF RACK**

(75) Inventor: **Glenn Harris**, Camarillo, CA (US)

(73) Assignee: **Southern California Gold Products, Inc.**, Camarillo, CA (US)

(**) Term: **14 Years**

(21) Appl. No.: **29/208,886**

(22) Filed: **Jul. 6, 2004**

(51) **LOC (8) Cl.** .................... 12-16
(52) **U.S. Cl.** .................... **D12/412**
(58) **Field of Classification Search** .............. D12/406, D12/412, 414, 414.1; 296/37.1, 3; 224/309–310, 224/315–316, 323, 324; D6/552; D3/304
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS



| | | | | | |
|---|---|---|---|---|---|
| D350,724 S | * | 9/1994 | Lichtbach | D12/412 |
| D377,780 S | * | 2/1997 | MacNeil | D12/221 |
| D413,562 S | * | 9/1999 | Van Dusen et al. | D12/412 |
| 6,068,168 A | * | 5/2000 | Kreisler | 224/309 |
| D470,451 S | * | 2/2003 | Bushart et al. | D12/412 |
| 2003/0029894 A1 | * | 2/2003 | Crane et al. | 224/319 |

* cited by examiner


*Primary Examiner*—Caron D. Veynar
*Assistant Examiner* -Katrina A. Kile
(74) *Attorney, Agent, or Firm*- -Marvin E. Jacobs; Robert J. Schaap

(57) **CLAIM**

The ornamental design for a roof rack, as shown and described.

**DESCRIPTION**

FIG. 1 is a perspective elevation view of a roof rack showing my new design, it being understood that the broken line showing of the vehicle is for illustrative purposes only;

FIG. 2 is a perspective elevation view of a roof rack showing my new design, it being understood that the broken line showing of the vehicle is for illustrative purposes only;

FIG. 3 is a frontal elevation view of a the roof rack;

FIG. 4 is a top plan view of the roof rack;

FIG. 5 is a bottom plan view of the roof rack;

FIG. 6 is a rear elevational view of the roof rack; and,

FIG. 7 is a left side elevation view of the roof rack, the right side elevation view is identical.

**1 Claim, 5 Drawing Sheets**









Fig. 1.

U.S. Patent Apr. 17, 2007 Sheet 2 of 5 US D540,736 S



Fig. 2.



Fig. 3.



Fig. 4.



Fig. 7.

# MUTUAL CONFIDENTIALITY AND NONDISCLOSURE AGREEMENT

This Mutual Nondisclosure Agreement is made and entered into as of this __ day of June, 2005 by and between SOUTHERN CALIFORNIA GOLD PRODUCTS, INC. ("SOUTHERN CALIFORNIA GOLD PRODUCTS, INC.") a California corporation, having a principal place of business located at 2350 Santiago Ct., Oxnard, CA 93030 and American Defense Systems, Inc. ("ADSI"), a Delaware corporation, having its principal place of business at 230 Duffy Avenue, Unit C, Hicksville, NY 11801.

WHEREAS, SOUTHERN CALIFORNIA GOLD PRODUCTS, INC. has developed certain non-public information relating to the design, systems integration, engineering, testing, manufacturing, assembly and marketing of vehicular racks and systems

WHEREAS, such information is of value to SOUTHERN CALIFORNIA GOLD PRODUCTS, INC. and such value would be adversely affected if such information became available to the public or known to the competitors of SOUTHERN CALIFORNIA GOLD PRODUCTS, INC., and

WHEREAS, ADSI has developed certain non-public information relating to the design, systems integration, engineering, testing, manufacturing, assembly and marketing of bullet resistant glass, glass frames and armor solutions;

WHEREAS, such information is of value to ADSI and such value would be adversely affected if such information became available to the public or known to the competitors of ADSI, and

WHEREAS, SOUTHERN CALIFORNIA GOLD PRODUCTS, INC. and ADSI are interested in working together to research the possible application of armor solutions, bullet resistant glass and glass frames to projects designed by SOUTHERN CALIFORNIA GOLD PRODUCTS, INC. and/or ADSI (the "Work"), and

WHEREAS, in the course of performing the work, SOUTHERN CALIFORNIA GOLD PRODUCTS, INC. and ADSI may have access to non-public information owned by the other party;

NOW, THEREFORE, in consideration of the promises and mutual covenants contained herein the parties hereby agree as follows:

1. Confidential Information. "Confidential Information" as used herein shall mean any and all samples, formula, methods, know-how, software, material, specifications, sketches, data, drawings, schematics, designs, processes, test results, compilations, and other documents, ideas, concepts or knowledge, whether oral written or stored in electronic media or obtained or obtainable by examination, testing, visual inspection or analysis of any material, equipment, product, part, hardware or component that a party to this Agreement (the "Receiving Party") receives from the other party to this Agreement ("Disclosing Party") in the course of preparing for the Work. Confidential Information shall not include any such knowledge which:

   (a) is in or hereafter comes into the public domain without breach of this Agreement by the Receiving Party or breach of any obligation or confidentiality by any person; or

   (b) is received by the Receiving Party from a third person without restrictions or breach of any duty of confidentiality; or

   (c) the Receiving Party can show that it was in possession or it was known to the Receiving Party by being recorded in its files or computers or other recording media prior to receipt from the Disclosing Party.

2. Disclosure of Confidential Information. Nothing in this Agreement shall require either party to disclose Confidential Information to the other party and any such disclosure shall only include such Confidential Information as the Disclosing Party determines, in its sole discretion, to be necessary for the performance of the Work.

Disclosing Party and Recipient agree as follows:

3. Use of Confidential Information. The parties agree, with respect to the Confidential Information as to which it is the Receiving Party:

(a) to protect and keep such Confidential Information from disclosure with the same degree of precautions and safeguards as it uses to protect and keep its own trade secrets and proprietary information, but in no case less than reasonable care;

(b) not to disclose or reveal such Confidential Information to any person other than representatives or advisors employed by it who have a need to know such confidential Information in the course of performing the Work and a contractual duty to maintain information that they receive in the course and scope of their employment in confidence; and

(c) not to use, or permit any person employed by it to use, such Confidential Information for any purpose other than the preparation for and the performance of the Work; and'

(d) to make the conditions of this Agreement known to any person to whom it discloses such Confidential Information and to obtain from such person a commitment to be bound hereby.

4. Responsibility for Actions of Employees and Others. Without limiting the requirements of the foregoing, the parties agree that they will be responsible directly to the other for the actions and inactions of their respective executives and employees, and the actions and inactions of any person to whom it discloses the Confidential Information as to which it is a Receiving Party; provided, however, that neither party shall have any liability to the other for the actions of its executives or employees or any other person to whom it discloses Confidential Information if the Receiving Party has taken reasonable precautions to prevent disclosure of Confidential Information by such other persons, which actions shall in all cases be at least equal to the precautions that it the Receiving Party takes to prevent disclosure of its own confidential information. Neither party shall be required to pursue the enforcement of this agreement or recovery of damages from any such persons individually before it seeks enforcement of this agreement or the recovery of damages directly from the other party.

5. Remedies. The parties to this Agreement acknowledge that any breach of the obligations contained herein will give rise to monetary damages but that the payment of such damages would be insufficient to adequately compensate the non-breaching party. The parties therefore agree that in addition to monetary damages for breach, either party who is the non-breaching party may seek an injunction or other equitable remedy and that no bond or other security shall be required to obtain such remedies. The foregoing notwithstanding, neither party shall be responsible to the other party for incidental or exemplary damages arising from such a breach of this Agreement.

6. Ownership of the Confidential Information. The Confidential Information shall be and remain at all times the sole and exclusive property of the Disclosing Party. Nothing in this Agreement shall be construed to create or grant any license or other rights in, to, or under the Confidential Information in favor of the Receiving Party.

7. Return or Destruction of Confidential Information. Upon written request from the Disclosing Party, the Receiving Party shall return to the Disclosing Party all physical items furnished by it and all copies thereof containing Confidential Information in any form whatsoever including but not limited to all written information, photographs, samples, drawings and computer software, storage media or devices.

8. Additional Limitations. In addition to the obligations set forth above, any Confidential Information that is classified under any category shall be handled, used , protected and otherwise treated by the Receiving Party in accordance with the security procedures prescribed by the applicable laws and regulations.

9. Termination. This Agreement shall remain in full force and effect for a period of two (2) years from the date of latest disclosure.

10. Entire Agreement. This Agreement constitutes the sole existing agreement between the parties regarding the subject matter hereof. This Agreement may be amended , modified, superseded, or canceled; or any o the terms , provisions, covenants, and conditions herein may be waived, only by written instrument executed by all parties hereto, or in the case of a waiver, by the party waiving compliance.

11. Governing Law; Jurisdiction and Venue. This Agreement is entered and shall be construed in accordance with the applicable laws of the State of California, excluding conflict of law principles or any other provision that would direct the application of the laws of a different jurisdiction. . The parties waive any claim that venue in California is inconvenient.

12. No Commitment to Enter Transaction. Each of the Parties hereto acknowledges that this Agreement shall not be construed as a commitment by either party to enter into any transaction involving the Confidential Information.

13. Notice. Notices shall be sent to the addresses designated as the principal place of business for the respective companies and to the attention of the individuals executing this agreement. Any notice required or permitted under this Agreement shall be effective on the earlier to occur of (i) the date actually received by the party to whom the notice is addressed, or (ii) the third (3rd) business day after the same is deposited in the US Mail, postage prepaid, addressed to the party at the address set forth above. Either party may change the address at which notices are sent and the designated recipient thereof by notice to the other party.

14. Noncompete. In the event that SOUTHERN CALIFORNIA GOLD PRODUCTS, INC. performs work commissioned by ADSI, then SOUTHERN CALIFORNIA GOLD PRODUCTS, INC. agrees not to compete with ADSI concerning the designs, products, devices and/or items which are contemplated and/or made in accordance with the specifications provided by ADSI for three (3) years from the date of latest disclosure. In the event that ADSI performs work commissioned by SOUTHERN CALIFORNIA GOLD PRODUCTS, INC , then ADSI agrees not to compete with SOUTHERN CALIFORNIA GOLD PRODUCTS, INC concerning the designs, products, devices and/or items which are contemplated and/or made in accordance with the specifications provided by ADSI for three (3) years from the date of latest disclosure.

15. Authority. The signatories below represent that they are authorized by their respective companies to execute this agreement and bind each company to the terms contained herein

EXECUTED as of the day and year first set forth above.

SOUTHERN CALIFORNIA GOLD PRODUCTS, INC..

By:_______________ 6-30-05

AMERICAN DEFENSE SYSTEMS, INC.

By:_______________ 6/30/05




# NOTICE TO VISITORS

The Gypsy Rack™ line of products are for Government, Military, and Law Enforcement use only. For more information call us at 805-988-0777 or by email

Click here for a listing of our Gypsy Rack™ Products

**LATEST NEWS**

- **Marines reveal tricks used to storm Baghdad. Water funnels and Gypsy Racks™ helped them keep 'logistics-light diet'**

Read more

- **The Gypsy Rack™ used extensively in Operation Iraqi Freedom.**

Read more

**NEW PRODUCT**

**HMMWV EMERGENCY EGRESS RESTRAINT SYSTEM**

- Safe, quick release, emergency egress design
- Basic 20 minute install
- No modifications to vehicle required
- Restrains occupant in extreme G-Load environments
- Design concept extracted from 40 years of proven motor sports testing
- Four point restraint, tension adjustable for all size occupants



Read more

**Click to see our product line**



**The Gypsy Rack™ comes in various configurations ranging from a spare tire/2 can carrier to an overhead 10+ can size carrier.**

- Extend the operational distance of your HMMWV
- Holds 30+ gallons
- Installs in under 20 minutes*
- No vehicle modifications required
- Durable Steel Alloy construction
- Track Rail for even more storage ability
- Made in the USA
- Used by the USMC

* Original *Gypsy Rack™*

Scooter
Authorized
Distributors



Read more

GSA

**On Site Design Program**

SCGP follows a strict on site design program beginning with a preliminary design review.
This first step is critical for the planning phase and will be followed by a critical design review at which point the final

**Manuals & Support**

**If you need manuals, schematics, or to speak with a technician, you you can visit the support and forum page at the link below.**

- **NEW - User Support Forum**
- **Manuals & Schematics**

## FOR PRICING PLEASE CONTACT US AT

## INFO @ GYPSYRACK.COM

Go to support

**Custom Up-Armor Services**




**Construction equipment up-armor packages. Custom made for individual packages.**

Read more

**Custom Services**

**Custom armor, accessories and modifications are our specialty. Our state of the art engineering & manufacturing facility can handle all your needs.**

**Legal information**

Hummer®, Humvee® HMMWV® and the Civilian Hummer®/Military Humvee® names and logos are registered trademarks of AM General Corporation and/or General Motors Corporation.

SCGP/Gypsy Rack™, are not affiliated with AM General Corporation or General Motors Corporation.

Gypsy Rack™ brand and logos are the sole respective property of Southern California Gold Products, Inc. All rights reserved.

Except as specifically permitted in accordance with the terms and conditions governing the use of this site, any use of such trademarks or trade names is strictly prohibited absent the prior written consent of their respective owners.

up armor approach and designs will be approved.
By staying in constant contact with the customer we can guarantee a final product that meets the complete scope of the contract.
This attention to detail is what makes our solutions stand above the competition and ensures you will receive the highest quality components for the war effort.



- Full Machining Capabilities
- Media Blasting
- 50" x 120" Autoclave
- Laser & Waterjet Cutting
- Chemical Coatings
- Hydro & Mechanical Forming

**Contact Us**

## Southern California Gold Products

SCGP designs and manufactures mil spec components for the defense and private industry. With a wide range of products in theater and development, we are constantly researching and developing new technologies to provide a superior solution.

With a 15 year history we have built the proper foundation to delivery a wide range of products that meet stringent specifications and timelines to guarantee mission success.

SCGP has been able to meet the design and delivery schedules previously thought impossible through our qualified staff and assertive planning. With a balanced approach to each contracts individual need, a realistic schedule is devised to ensure accurate production goals.

Our team of employees are dedicated to deliver a complete package to the customer.



Southern California Gold Products headquarters in Oxnard, Ca. USA





Copyright © 2006 Southern California Gold Products, Inc.




Kit Instructions






New Raised Roof & Rollbar Kit for Military HUMVEE



Mercedes Benz G-500 3rd Row Seat Kit

NEW **OPEN TOP** CONVERSION KITS FOR HUMMER





Hot New Military Kits Available!




**New SlantBack!**

Home



- Removable
- Light Weight
- All Aluminum
- Weather Tight
- Easy to Install
- Secures Vehicle
- Lockable
- Modular in 3 sections

---

## Also Available for Open Tops: Wagonback ™ Model



**California Gold** is proud to offer a line of custom parts, accessories and conversion kits to help you get the most from your vehicle.

Accessories and custom conversion kits for HMMWV Hummer vehicles.

June 11, 2007

2007 JUN 11 PM 2:20
RECEIVED USGAO

Via Fed Ex
General Counsel, Government Accountability Office
441 G Street, N.W.
Washington, D.C. 20548
Attention: Procurement Law Control Group

Re: Solicitation N62473-07-C-4055

Dear Sir/Madam:

Enclosed please find American Defense Systems, Inc. request for relief together with supporting documentation in regards to Solicitation N62473-07-C-4055

REQUEST FOR RELIEF

In accordance with 4 Code of Federal Regulations § 21.1, Federal Acquisition Regulations §33.103 and §33.104 American Defense Systems, Inc. is protesting the award of Solicitation N62473-07-C-4055 , made on or about June 7, 2007, in part to Southern California Gold Products and in part to American Defense Systems, Inc. American Defense Systems, Inc. is submitting a timely protest. Due to the urgent need articulated in the solicitation, American Defense Systems, Inc. respectfully requests a ruling using an express option schedule.
Subsequent to the contract award, American Defense Systems, Inc. requested a debrief concerning the award of the contract and the bid submittal of American Defense Systems, Inc. American Defense Systems, Inc. has not received a debrief of why the contracting officer opted to split the award of this contract nor why an unqualified vendor. Southern California Gold Products, Inc. was granted a partial award of the contract.
American Defense Systems, Inc. was informed by the contracting authority that all aspects of its bid had been deemed to be satisfactory, but the partial award had been made to Southern California Gold Products Inc who also had achieved a satisfactory in all aspects of the contract submittal but had provided a lower price. American Defense Systems, Inc is an interested party with standing to seek relief herein.
It is respectfully requested that the General Accounting Office issue an Order granting the following relief:

1. A ruling by the Comptroller General of the United States;
2. Due to the urgent need articulated in the solicitation, American Defense Systems, Inc. respectfully requests a ruling using an express option schedule.
3. Issue a Protective Order Enjoining the Contracting Authority from Rendering a Final decision and Authorizing Southern California Gold Products from commencing work on Solicitation N62473-07-C-4055 until such time as the Comptroller General of the United States renders a final decision on this matter;

4. Issue a Protective Order Precluding Southern California Gold Products from converting American Defense Systems, Inc. designs, products, test results from United States Army Aberdeen Test Center, test data, copyrights, trademarks and property;
5. Grant American Defense Systems, Inc. a hearing concerning the review of this matter in an expeditious manner;
6. Provide American Defense Systems, Inc. with copies of all documents considered by the Contracting Officer for the partial awards granted under this Solicitation;
7. Issue an Order awarding the contract to American Defense Systems, Inc. in its entirety for the bid amount as submitted by American Defense Systems, Inc. as the sole qualified bidder on the contract;
8. Such other and further relief as the General Accounting Office may deem just and proper

Thomas F. Cusack
Vice President, Corporate Counsel, Secretary
American Defense Systems, Inc.

AMERICAN DEFENSE SYSTEMS, INC. IS THE ONLY QUALIFIED BIDDER FOR THE CONTRACT

It is respectfully submitted that American Defense Systems, Inc. is the only qualified bidder for contract Solicitation N62473-07-C-4055. Upon information and belief, Southern California Gold Products, Inc. is not a qualified bidder in that it has not previously provided Add-On Armor Construction and Material Equipment kits (AoA CME) for use by United States Armed Forces personnel, it lacks transparent and opaque armor solutions which have been tested by United States Army Aberdeen Test Center, may be seeking to convert American Defense Systems, Inc. designs and products and Notably, the Contracting Officer reduced the protection requirements for this solicitation as compared with those required under a substantially similar solicitation (Solicitation N62473-07-R-2024 annexed hereto as Exhibit "A") was incorrectly awarded just weeks prior under an urgent need for substantially similar or identical equipment. (Current GAO Protest B-299790)It is respectively submitted that any award for substantially similar or identical equipment must be held to the same standards as the immediately prior solicitation. Failure to require adequate testing of the armor by United States Army Aberdeen Test Center (which was an integral part of the first solicitation but which was removed from the second solicitation) creates the potential for the fielding of defective and/or inadequate equipment which substantially increases the possibility of injury and/or loss of life for the Sailors who are deployed in harms way.

Additionally, upon information and belief, Southern California Gold Products, Inc. does not hold a facility security clearance or have security cleared personnel. It is respectfully submitted that while facility security clearance was not specified as part of the instant solicitation, the information required in order to bid the solicitation is subject to security clearance. The Solicitation specifically requires the use of specific transparent and opaque armor solutions but it fails to specify to what threat level components are to comply. The contract does specify in Clin 2.3.2.3 that the: Transparent armor shall exceed the threat level of the opaque armor. While the use of certain materials are called out as the basis of the opaque armor and two providers of apparently qualified transparent armor were identified Sierricin and American Defense Systems, Inc., the contracting officer has not called out the ballistic protection levels with particularity. **Upon information and belief, no party could submit a bid which would provide transparent and opaque armor solutions which meet the ballistic requirements which are requested in the solicitation (whereby the transparent armor solution would exceed the performance of the opaque armor solution) without having access *to the classified test results performed* by the United States Army at the Aberdeen Test Center pertaining to both the opaque and transparent armor solutions. The contracting officer has removed a specific requirement that the transparent and opaque armor be tested at the United States Army Aberdeen Test Center while continuing to require *the exact same ballistic protection* for both the transparent and opaque armor solutions as required in the previous solicitation.** Consequently, Southern California Gold Products, Inc. is not a qualified bidder on either solicitation.

AMERICAN DEFENSE SYSTEMS, INC. IS THE ONLY COMMERCIAL VENDOR FOR THE SPECIFIED EQUIPMENT

Upon information and belief, this current Solicitation was not issued for competitive bid via Federal Business Opportunities (FedBizOps). The Contracting Officer opted to inform two small business vendors which it deemed qualified to perform the work (American Defense Systems, Inc. and Southern California Gold Products, Inc.). Significantly, each of these vendors had recently bid on a substantially similar solicitation. The Contracting Officer has delineated this Solicitation to be a Commercial Buy. Each vehicle presents unique design challenges; so while American Defense Systems, Inc. has produced and fielded armor solutions for some of the equipment delineated in the Solicitation, there is no commercially available CME for every piece of equipment within the Solicitation. Based upon its extensive experience in designing CME's, American Defense Systems Inc. has commercially available Add-On Armor for Construction and Material Equipment (AoA CME) for the following vehicles already designed, reviewed and approved for production by the United States Army and The United States Marine Corps, some of which have been fielded in Iraq. The common AoA CME's named in this contract are:

- 621B CAT Scraper
- 2K water distributor MFW-SH w/ CAT prime mover
- 11K MMV JLG Telehandler

This means all engineering costs, prototyping, PPL's, ASL's, trade-off studies and technical data packages (TDP's) have been performed or are in process and have been paid for by the government as a one time non-recurring fee. If the Navy made a commercial purchase of these CME's from ADSI it would pay for engineering modifications, not a totally new engineering design efforts which would result in untested CMEs. These untested CME may or may not provide adequate ballistic protection and would not be proven tested systems. Conversely, American Defense Systems, Inc. can draw upon its engineering expertise and experience as well as the proven concepts developed for these previous CME's. This is a significant savings to the Navy and one that affords the Navy expedited delivery to its sailors. If the Navy's need is urgent than these items should be purchased directly from ADSI.
The contracting authority did award the production of the Scraper CME to American Defense Systems, Inc. but inexplicably awarded the 2K water distributor and 11K MMV to Southern California Gold Products, Inc. Additionally, American Defense Systems, Inc. has successfully designed, produced, tested, delivered, and installed AoA CME for Compactor variants and Bulldozer variants (D7G as compared to the D8N specified in the Solicitation) which were also awarded to Southern California Gold Products, Inc.

In total the Contracting Officer awarded the production of 14 AoA CME to American Defense Systems, Inc. and 23 AoA CME to Southern California Gold Products, Inc. Based upon contract valuation approximately 66% of the contract was awarded to Southern California Gold Products, Inc. despite their lack of applicable experience, lack

of armor solutions which are tested at Aberdeen Test Center, lack of a track record of delivering AoA CME under an urgent need, inexperience in delivering AoA CME

SOUTHERN CALIFORNIA GOLD PRODUCTS INC. WAS GRANTED AN UNFAIR ADVANTAGE

Upon information and belief, Southern California Gold Products, Inc. its officers, employees and/or agents were granted access to vehicles which are the subject of the Solicitation either prior to or during the Solicitation Bid process. This information and belief is predicated upon discussions had between John Rutledge, VP of Sales for American Defense Systems, Inc. and the Contracting Officer on June 5, 2007. During the conversation, Mr. Rutledge was informed that the Contracting Officer was considering a split award of the contract between American Defense Systems. Inc. and Southern California Gold Products, Inc. The Contracting Officer indicated that Southern California Gold Products, Inc. personnel had stated that there was a significant challenge to armoring certain vehicles, particularly cranes, due to center of gravity challenges. Mr. Rutledge informed the Contracting Officer that while American Defense Systems, Inc. had not had access to the vehicles in question, it did have expertise in solving armoring challenges including the unique challenges presented by cranes. American Defense Systems, Inc. has armored several different types and variants of crane for the United States Armed Forces

Additionally, upon information and belief, Southern California Gold Products Inc. may have been provided with additional solicitation specifications prior to the receipt by American Defense Systems, Inc. The partial original solicitation documents were provided to American Defense Systems, Inc. on June 1, 2007 (Partial Solicitation annexed as Exhibit "B"). On June 5, 2007, American Defense Systems, Inc. was informed that additional solicitation requirements were being added including a provision for vehicular tires. American Defense Systems Inc. received the additional solicitation requirements on June 6, 2007 (Solicitation annexed as Exhibit "C") and was required to respond to the revised solicitation requirements on June 6, 2007. **American Defense Systems Inc. did not receive a complete solicitation until the day that the response to the solicitation was due.** American Defense Systems, Inc. submitted a timely bid response (American Defense Systems, Inc. Solicitation response annexed as Exhibit "D") which resulted in a partial award (United States Navy partial award annexed as Exhibit "E").

TESTING AT UNITED STATES ARMY ABERDEEN TEST CENTER FOR OPAQUE AND TRANSPARENT ARMOR

It is respectfully submitted that Southern California Gold Products has not had testing of either opaque or transparent armor solutions at United States Army Aberdeen Test Center. While this Solicitation was not specifically called out in the Solicitation it was called out in an immediately preceding Solicitation. These requirements were specifically called out in the prior Contract Solicitation (See Prior Solicitation annexed hereto as Attachment Exhibit "A").. It is respectfully submitted that the failure to have proper testing for transparent and opaque armor continues to disqualify Southern California

Gold Products, Inc. as a bidder for the contract. It is respectfully submitted that the apparent request by the contracting authority to allow the use American Defense Systems, Inc. test results in order to qualify Southern California Gold Products, Inc. for transparent and opaque armor testing is either an intentional violation of the contract solicitation and/or negligent. The American Defense Systems, Inc. transparent and opaque armor are not merely generic solutions. The transparent and opaque armor solutions are proprietary designs which utilize patent pending designs to afford superior ballistic and blast resistant qualities while minimizing weight. The test data pertaining to those armor solutions as tested at Aberdeen Test Center is classified.

A TESTED MATERIAL DOES NOT MAKE A TESTED ARMOR SOLUTION OR AOA CME

The Navy provided the choice of armor material to use for the CME contracts. The Navy directed use of 3/8 inch thick Rolled Homogenous Armor (RHA), class II, IAW MIL-A-12560 with a welded exterior appliqué of 3/8 inch thick structural steel IAW ASTM A36. The United States Army, at Aberdeen Test Center (ATC), had tested these materials **as specifically welded pursuant to American Defense Systems, Inc. engineered *solutions*** *and found them to meet their OIF/OEF test requirements.* What was missing from the Navy's material recommendation was the specific way in which the composite steel plate solution was to be attached to one another; or the exact size of the plug weld holes, the spacing of the plug welds, the location of the seem welds, the spacing of the seem welds, the length of the seem welds, the type and depth of penetration of the welds and the type of welding rod and method of welding. All of these variables were left to the armor contractor to design and provide samples to ATC to test. ADSI's custom solution was tested and determined to pass or exceed all ATC requirements for the OIF/OEF threat.

After studying the cost of material, fabrication, and material availability, ADSI choose to go with the steel on steel solution. Our engineering team studied the means and methods we would use in manufacturing the panels and then we developed a method for welding the plates together that would be as uniform as possible when manufacturing the actual armor components making-up the ADSI custom designed armor solution. The representative samples supplied to ATC reflected the same ADSI weld pattern, type of welds and methodology that would be used for all kit panels.

In addition to the armor composite steel plate, there must be tested and approved methods for that plate to be attached to a vehicle; **this method is not provided by the government.** ADSI engineers researched and developed a very unique and proprietary method for accomplishing this task. We developed a sub-frame system with an innovative 'Large hole' attachment method allowing the armor panels the ability to be adjusted in the 'X' and 'Y' direction. This is critical when installing the panels to the vehicle, since it allows the required tolerance necessary to mate the panels to vehicles that have varying dimensional tolerances between same type units due the manufacturing deviations or post manufacturing modification or accidents. The system includes a custom large armor material cut washer that provides a protective cover for this large hole. ADSI custom 'Large hole' attachment system was exploitation tested by ATC, where the bolt head was hit dead-on by a 20MM FSP rounds and passed without

penetration. The other innovation of ADSI's attachment system is that the sub-frame which is a tubular steel section frame welded to the vehicle structure. The fastening locations are manufactured into one side of the tube section. The method allows the threaded receiver and the bolt to be captured by the frame isolating the bolt from the inside of the cab. This is a very important innovation which has proven through testing to prevent the bolt from becoming a secondary projectile during exploitation testing with 20MM FSP rounds. The ADSI proprietary fastening method was tested at ATC and passed or exceeded all tests.
A third innovation of the 'Large Hole' attachment system is a non-rigid corner. In conventional armor solutions the corners had been welded or formed creating a rigid corner. Rigid corners resist deformation. The ability for the corners to deform under load increases the armor solution's ability to absorb energy. ADSI has proven this through independent ROP (roll-over protect) testing we conducted on an ADSI armored cab. The cab was the first know armored cab to pass the energy absorption phase of the standard ROP certification test.
In addition to developing an attachment system ADSI engineers developed details for seeming panels, ballistic battens, ballistic door stops, bullet resistant housings for evaporator units and bullet traps for air intake all of which have been approved by ATC and TACOM.

AN APPROVED ARMOR SOLUTION OR KIT REQUIRES TESTING OF THE DOOR HINGES, DOOR LATCHING MECHANISM, COMBAT LOCK AND THE EGRESS WINDOW.

ADSI has developed proprietary hardware systems that are an integral part of the tested an approved armor solutions or AoA CME kits. Hardware contractually must be tested to operate properly, combat locks must be removable from the exterior of the vehicle with the use of a combat rescue wrench to facilitate rescue efforts and can not become a secondary projectile when hit with a 20MM FSP round during testing. All ADSI proprietary hardware was tested at ATC and passed or exceeded test requirements.

AN ARMOR SOLUTION OR AOA CME CAN NOT BE DEEMED FIT FOR THE SAILOR UNLESS THE PIECE OF EQUIPMENT HAS BEEN TESTED WITH THE CME FOR SAFETY, DRIVABILITY, OPERATIONAL CAPABILITY, DURABILITY, ENVIRONMENTAL. EASE OF MAINTENANCE AND TRANSPORTABILITY.

ADSI engineer's prepared both TOA (Trade off Analysis) and Safety Assessment Reports for all (6) CMEs under its original CME contracts with TACOM and one additional CME for the USMC TRAM. The reports where used to access the vehicles for safety and operability.

All ADSI armor solutions or AoA CME's were tested by ATC for safety. All edges, pinch points, trip hazards and hard surfaces that were of concern to the safety officer were address and ADSI engineers designed modifications or installed warning labels that met or exceeded the safety officer's expectations. ADSI also design an armored fuel cell

for the D7G bulldozer in order to get the fuel tank outside the armor cab. All vehicles with ADSI CMEs passed or exceeded all ATC tests.

All ADSI AoA CMEs installed vehicles were drivability tested for acceleration, braking, maneuverability, maximum slope angle, stability under load and without load both off-the-road and on the road. All vehicles with ADSI CMEs passed or exceeded all ATC tests.

All ADSI AoA CME installed vehicles were tested operationally by heavy equipment operators, digging, lifting and pushing. All vehicles with ADSI CMEs passed or exceeded all ATC tests.

Environmental testing: All ADSI AoA CME installed vehicles went through hot box testing to ensure that the vehicles met the cool down requirements set forth in the contract. ADSI modified Red Dot air conditioning equipment for installation in all AoA CMEs including air distribution ductwork need to get cool air to the operator. ADSI also modified the design of Red Dot heating equipment used to heat the un-heat cabs to meet the heating requirements set forth in the contract. All vehicles with ADSI CMEs passed or exceeded all ATC tests.

Ease of Maintenance: ADSI designed access hatches, hose connection, brackets, cab removal on the D7G dozer and the relocation of an electrical fuse panel on the 130G grader so that routine maintenance could be performed. All vehicles with ADSI CMEs passed or exceeded all ATC expectations.

Transportability: ADSI designed a universal proprietary lift and tie down provision that is used on all ADSI AoA CMEs and was tested by ATC to meet the 209K lift and tie requirements. Including special axial shims for the 130G grader and designed modification plates for the MW24 loader. All vehicles with ADSI CMEs passed or exceeded all ATC tests.

PAST PERFORMANCE

Past performance was stated to be a contract requirement in the preceding solicitation. It is respectfully submitted that American Defense Systems, Inc. is the preeminent provider of comprehensive transparent and opaque armor solutions for the United States Armed Forces Southern California Gold Products, Inc. has performed work as a subcontractor to American Defense Systems, Inc. Southern California Gold Products Inc. did not possess experience in designing, engineering, fabricating and/or installing transparent and/or armor solutions for construction equipment, prior to working as a subcontractor for American Defense Systems, Inc.

It is respectfully submitted that Southern California Gold Products Inc. lacks the experience as a Prime Contractor that would warrant an acceptable rating for Past Performance. Southern California Gold Products, Inc. has provided non-armored racking systems and accessories for HMMWV to United States Armed Forces, however, upon information and belief they do not possess relevant experience as a provider of transparent and opaque armor for Construction and Material Equipment armor kits.

PRICE

It is respectfully submitted that American Defense Systems, Inc. has submitted competitive bid pricing. Notably, American Defense Systems, Inc. had provided and is providing Construction and Material Equipment armor kits to the United States Army, United States Marine Corps and United States Navy for substantially similar vehicles. These kits are being provided via competitively solicited and awarded Contracts including but not limited W56HZV-06-C-0038. In the case of the 621B Scraper, American Defense Systems Inc. is currently providing kits to the United States Navy based upon the competitively solicited and awarded contract W56HZV-05-D-0382. The Solicitation bid for this contract provided for the production and delivery of 26 Scraper kits consistent with the competitively solicited and awarded contract price. Conversely, Southern California Gold Products, Inc. lacks significant experience in designing, engineering, fabricating and delivering Construction and Material Equipment armor kits. Additionally, Southern California Gold Products, Inc. has not provided complete Construction and Material Equipment armor kits pursuant to an urgent need. It is respectfully contended that Southern California Gold Products, Inc. can not be deemed to be a qualified bidder as they lack the requisite experience to accurately assess the costs associated with the design, fabrication and delivery of Construction and Material Equipment armor kits pursuant to an urgent need.

COMMONALITY

An additional Solicitation requirement was to provide "commonality". Specifically the Solicitation requires the use of a frame and Egress/Ingress Windows which are common to those developed by American Defense Systems, Inc. The Solicitation states in pertinent part (emphasis added to distinguish those items which are proprietary to American Defense Systems, Inc. designed CME armor kits):

2.3.2 Armor Solution Specifications. Each CME armor kit shall include the following:
Composed of same material and design for all variants.
Utilize same hardware, "combat" locks and same method of egress/ingress.
Similar to current U.S. Navy CME armor kits to ensure commonality.
Include an "A" kit and "B" kit design with IED underbody blast protection. An "A" kit will consist of a frame that holds all armor panels, armor doors and transparent armor. Additionally, the "A" kit will include under body armor panels. The "B" kit will be composed of all other armor panels, armor doors and transparent armor.
Be "gapless" in nature with overlapping seams. Have a functioning window, door and one method of egress/ingress (in addition to the door). The door will NOT be considered as the egress/ingress. Shall include an air conditioning system other than the OEM equipment air conditioning unit. Shall have a functioning heater. The contractor is authorized to use existing equipment for the heater.

2.3.2.7. Egress/Ingress. Each CME armor kit shall have an egress/ingress window. The design of the egress/ingress window shall be common to current egress/ingress windows available in current U.S. Navy CME armor kits. In the event the egress/ingress requires a special tool for use, the tool shall be affixed both inside and outside of the CME armor kit and shall be in plain sight. The ingress/egress window shall not be on the same side of the CME armor kit as the door.

**The Armor Solution Specifications and Egress/Ingress Specifications specifically call out American Defense Systems, Inc. products and designs. Additionally, the *Solicitation specifications specifically call out 2 potential providers of transparent* armor because they have been tested at Aberdeen Test Center (Siaricin and A.D.S.I)**
American Defense Systems, Inc. *is already providing commonality across a spectrum of* Construction and Material Equipment armor kits. American Defense Systems, Inc. has worked closely with United States Army Tank Automotive Command (TACOM) to maximize commonality both within each Construction and Material Equipment armor kit and across armor solutions for Construction and Material Equipment armor kits for different vehicles. American Defense Systems, Inc. has developed a patent pending ingress and egress window that may be utilized on each Construction and Material Equipment armor kit. American Defense Systems, Inc. has developed a patent pending combat lock that may be utilized on each Construction and Material Equipment armor kit. American Defense Systems, Inc. has developed patent pending wiper blade and wiper blade extension that may be utilized on each Construction and Material Equipment armor kit. American Defense Systems, Inc. has developed proprietary solutions to insure proper

air transportability and other unique features to insure compliance with contract requirements.

## BEST VALUE TO THE GOVERNMENT

The American Defense Systems, Inc. solicitation bid clearly demonstrates the ability to provide superior products in response to an urgent need. The solicitation was released under an urgent need and American Defense Systems, Inc. is the only bidder which has actually provided Construction and Material Equipment armor kit under an urgent need. American Defense Systems, Inc. has regular inspection conducted by DCMA under existing contract protocols. American Defense systems, Inc. is providing Construction and Material Equipment armor kits on an ongoing basis. American Defense Systems, Inc. has the proven design, engineering, fabrication, pricing, quality assurance and controls, delivery and support to fulfill all contract requirements. American Defense Systems, Inc. provides the best value to the government.

American Defense Systems, Inc. has the proven capability to provide thoroughly tested transparent and opaque armor solutions, possesses extensive past performance and has submitted pricing information which is consistent with previously awarded contracts which were awarded via competitive bid. American Defense Systems, Inc. provides the best value to the government and to the war fighter.
It is respectfully requested that in addition to a review of the American Defense Systems Inc. documentation submitted herein that the General Accounting Office review the Southern California Gold Products, Inc. bid in its entirety to ascertain whether Southern California Gold Products, Inc. provided the necessary proof of testing of transparent armor solutions at Aberdeen Test Center, the necessary proof of testing of opaque armor solutions, the necessary proof of past performance and the necessary proof that their bid price was in fact responsible.

## SOUTHERN CALIFORNIA GOLD PRODUCTS, INC. MAY BE IN VIOLATION OF FEDERAL ACQUISITION REGULATION 52.227-2

Upon information and belief, Southern California Gold Products Inc. has violated Federal Acquisition Regulation 52.227-2 as incorporated by reference in the Solicitation/Contract/Order for Commercial Items. **American Defense Systems, Inc. has developed unique designs, processes and products.** Some of these designs and products are subject to patent applications. The following patents pertain to designs and products which were developed by American Defense Systems, Inc. and aspects of which may be utilized for the development, design, production and installation of Construction and Material Equipment armor kits

- U.S. Pat. App. Ser. No.: 10/879,880 Asymmetric Composite Materials
  - U.S. Pat. App. Ser. No.: 11/530,647 Articles, Manufacturers and Assemblies Utilizing Configured and Sized Plates Comprised of

Penetration Resistant Laminated Constructs of Asymmetric Composite Materials

- U.S. Pat. App. Ser. No.: 11/530,591 Anti-Ballistic Egress Window
- o U.S. Pat. App. Ser. No.: 60/825,199 Door Latch (including Combat Lock and Rotary Latch)
- U.S. Pat. App. Ser. No.: 60/880,200 Wiper Arm Extension
- U.S Pat. App. Ser. No.: 60/825,206 Wiper Arm

Southern California Gold Products, Inc. obtained access to data pertaining to the aforementioned patent filings while working as a subcontractor to American Defense Systems, Inc. Upon information and belief, Southern California Gold Products, Inc. did not have experience in solving the unique challenges presented by creating and fielding Construction and Material Equipment armor kits prior to working as a subcontractor for American Defense Systems, Inc.

Furthermore, American Defense Systems, Inc. parent patent application referred to above, U.S. Pat. App. Ser. No.: 10/879,880 entitled "Asymmetric Composite Materials" was filed on June 29, 2004 and is directed to compositions and methods used to protect subjects from high velocity projectiles and explosion fragments in combat situations through the use of asymmetric laminated composite materials. Because Southern California Gold Products, Inc. and American Defense Systems, Inc. did not enter into the Mutual Confidentiality and Nondisclosure Agreement until June 30, 2005. Southern California Gold Products, Inc. could not have gained the knowledge to provide the services required to perform the instant contract without wrongfully gaining and now utilizing and infringing at least one American Defense Systems, Inc. patent application in violation of the contract requirements as delineated in Federal Acquisition Regulation 52.227-2.
American Defense Systems, Inc. possesses patent pending information concerning the design and make-up of transparent and opaque armor, the assembly and integration of transparent and opaque armor kits, anti-ballistic egress window, door latch including combat lock and rotary latch and wiper arm and wiper arm extension units. Each of these designs together with the types of materials used and the form of bonds, welds and hardware is proprietary to American Defense Systems, Inc. Upon information and belief, Southern California Gold Products, Inc. has violated the contract requirements as delineated in Federal Acquisition Regulation 52.227-2 by infringing upon American Defense Systems, Inc. patents pending and/or copyrights. American Defense Systems, Inc. reserves all rights to the intellectual property developed by American Defense Systems, Inc. The text of FAR 52.227-2 is annexed below and incorporated herein:

**52.227-2 -- Notice and Assistance Regarding Patent and Copyright Infringement.**

As prescribed at 27.202-2, insert the following clause:

**Notice and Assistance Regarding Patent and Copyright Infringement (Aug. 1996)**

(a) The Contractor shall report to the Contracting Officer, promptly and in reasonable written detail, each notice or claim of patent or copyright infringement based on the performance of this contract of which the Contractor has knowledge.

(b) In the event of any claim or suit against the Government on account of any alleged patent or copyright infringement arising out of the performance of this contract or out of the use of any supplies furnished or work or services performed under this contract, the Contractor shall furnish to the Government, when requested by the Contracting Officer, all evidence and information in possession of the Contractor pertaining to such suit or claim. Such evidence and information shall be furnished at the expense of the Government except where the Contractor has agreed to indemnify the Government.(c) The Contractor agrees to include, and require inclusion of, this clause in all subcontracts at any tier for supplies or services (including construction and architect-engineer subcontracts and those for material, supplies, models, samples, or design or testing services) expected to exceed the simplified acquisition threshold at FAR 2.101.Southern California Gold Products, Inc. has violated a mutual non-disclosure and noncompete agreement and may have violated FAR 52.227-2. Consequently, Southern California Gold Products, Inc. does not provide the best value to the government and the contract should be awarded to American Defense Systems, Inc. as the only qualified bidder. Alternatively, the award should be voided and the solicitation should be resubmitted for bidding.

GENERAL ACCOUNTING OFFICE HAS THE AUTHORITY TO GRANT THE RELIEF SOUGHT BY AMERICAN DEFENSE SYSTEMS, INC.

The General Accounting Office is empowered to grant both injunctive and contractual relief per 4 Code of Federal Regulations § 21.1, Federal Acquisition Regulations §33.103 and §33.104. American Defense Systems. Inc. contends that the contracting process was not properly executed. The bid protest standards are articulated by The Tucker Act, as amended by the Administrative Disputes Resolution Act (ADRA), 28 U.S.C. §1491(b) (2004) and confers jurisdiction upon the United States Court of Federal Claims

> to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement. 28 U.S.C. §1491(b)(1).

American Defense Systems, Inc. has clearly demonstrated that it is an interested party as it submitted a bid on the within solicitation. Additionally, the award should be set aside if the award either lacked a rationale basis or the procurement procedure involved a violation of regulation or procedure. It is respectfully submitted that the award of this solicitation lacked a rationale basis and violated regulations and procedures. The award was made in violation of the terms of the solicitation. The award was arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law. The awardee is not eligible for the award as the awardee is not a qualified bidder. The award must be set aside as a matter of law. [See Dickinson v. Zurko, 527 U.S.

150 (1999); Emerald Coast Finest Produce Co., Inc. v. the United States and Military Produce Group, LLC, United States Court of Federal Claims No. 06-742 C (2007).

SOUTHERN CALIFORNIA GOLD PRODUCTS, INC. MUST BE PRECLUDED FROM THE CONVERSION OF AMERICAN DEFENSE SYSTEMS, INC. DESIGNS, PRODUCTS, AND TEST RESULTS

American Defense Systems, Inc. further contends that Southern California Gold Products, Inc. is seeking to convert American Defense Systems, Inc. patent pending designs, products, and test results for transparent and opaque armor from United States Army Aberdeen Test Center, technical data, trade secrets, copyrights, trademarks and property.

The Economic Espionage Act of 1996 (18 U.S.C. § 1831-1839) makes the theft or misappropriation of a trade secret a federal crime with associated monetary penalties. It is a codified version of the common law tort of 'conversion'.

## A HEARING SHOULD BE HELD CONCERNING THIS SOLICITATION

It is respectfully requested that a hearing be held in this matter. Among the factors necessitating a hearing are:

1. American Defense Systems, Inc. could suffer irreparable harm;
2. The award lacked a rationale basis or the procurement involved a violation of regulation or procedure;
3. There is the potential for delivery of non-conforming and untested goods which could put Sailors at risk, it is necessary that a hearing be held concerning this solicitation.

It is respectfully requested that the General Accounting Office issue an Order granting the following relief:

1. A ruling by the Comptroller General of the United States;
2. Due to the urgent need articulated in the solicitation, American Defense Systems, Inc. respectfully requests a ruling using an express option schedule.
3. Issue a Protective Order Enjoining the Contracting Authority from Rendering a Final decision and Authorizing Southern California Gold Products from commencing work on Solicitation N62473-07-R- 2024 until such time as the Comptroller General of the United States renders a final decision on this matter;
4. Issue a Protective Order Precluding Southern California Gold Products from Converting American Defense Systems, Inc. designs, products, test results from United States Army Aberdeen Test Center, test data, copyrights, trademarks and property;
5. Grant American Defense Systems, Inc. a hearing concerning the review of this matter in an expeditious manner;
6. Provide American Defense Systems, Inc. with copies of all documents considered by the Contracting Officer for the partial awards granted under this Solicitation;
7. Issue an Order awarding the contract to American Defense Systems, Inc. in its entirety for the bid amount as submitted by American Defense Systems, Inc. as the sole qualified bidder on the contract;
8. Such other and further relief as the General Accounting Office may deem just and proper.

Thomas F. Cusack
Vice President, Corporate Counsel. Secretary
American Defense Systems, Inc.

DEPARTMENT OF THE NAVY
**NAVAL FACILITIES ENGINEERING COMMAND**
**Attn: Code 00C**
**Washington Navy Yard**
**1322 Patterson Avenue SE Suite1000**
**Washington Navy Yard, DC 20374-5065**

June 21, 2007

Nora K. Adkins, Esq.
U.S. Government Accountability Office
441 G Street, N.W.
Washington, D.C. 20546

Subj: GAO B-299867
Protest of American Defense Systems, Inc.
Under solicitation N62473-07-R-4054

Dear Ms. Adkins:

This responds to your request for a report on the protest of American Defense Systems, Inc. (ADSI), B-299867, (Enclosure (1)) concerning their partial denial of award under request for proposals N62473-07-R-4054, for Armor Solution Kits. Enclosure (2). The protester alleges that it was entitled to all of the awarded items as the only qualified offeror. For the reasons that follow, the agency requests that the protest be dismissed and denied.

## CONTRACTING OFFICER STATEMENT OF FACT

**Earlier solicitation**

An earlier commercial item solicitation, N62473-07-R-4024, for armoring of the same construction and material equipment (CME) as the instant solicitation was issued April 4, 2007 in support of Operation Iraqi Freedom (OIF) and the Global War on Terrorism (GWOT). The requirement was initiated by the Naval Facilities Engineering Logistics Center (NFELC), Port Hueneme, CA. NFELC is a subordinate activity of the Naval Facilities Engineering Command (NAVFAC). The requirement was synopsized as on March 25, 2007 and the solicitation issued by the Specialty Center Contracts Corps (SCCC), Port Hueneme, CA, which is also a subordinate activity of NAVFAC. The original solicitation closed April 18, 2007.

ADSI and Southern California Gold Products (SCGP) responded to the earlier solicitation. Both offered the same opaque armor - 3/8" thick rolled homogenous armor with welded on exterior of 3/8" structural steel ASTM A-36. This is the same opaque armor used in U.S. Army Tank Automotive Command (TACOM) contracts W56HZV-06-C-0038 and W56HZV-05-D-0382 (Prime contractor: ADSI) and Navy contract N62473-07-C-4014 (Prime contractor: SCGP). (SCGP's performance under its Navy contract has been very satisfactory and was considered in the instant source selection.) For transparent armor, the awardee offered 2.5"

thickness Sierracin glass and ADSI proposed its proprietary 2.2" thickness ballistic glass. The offerors were also asked to provide the results of specific ballistic testing at the Army Test Center (ATC) at Aberdeen, Maryland. However, neither offeror could provide such documentation. The ballistic characteristics of the armor set forth in the statement of work (SOW) had never been specifically tested at ATC. However, ATC had tested the armor under its own set of criteria. Because the results were classified, Navy officials with the necessary security clearances had to contact ATC directly for data regarding that testing. While the results of ballistic testing at ATC are classified, the level of threat protection assigned to armor (transparent or opaque) is not classified and would be available from the manufacturer.

Both offers were found to be technically acceptable and award was made on May 8, 2007, to SCGP, since its price was significantly less than ADSI's offered price. The contracting officer was aware of a dispute between ADSI and SCGP over alleged proprietary data involved in the manufacture and supply of CME armor kits and that SCGP had been successfully providing armor kits meeting the Navy's requirements under another contract. Pursuant to its request, ADSI was provided a debriefing and on May 14, 2007 ADSI filed an agency level protest with the contracting officer. However, before that protest could be addressed, ADSI filed a protest with your office on May 17, 2007. Your office dismissed most of that protest *sua sponte* as a matter solely within the jurisdiction of the Court of Federal Claims under 28 U.S.C. § 1498. However, in preparing its response to the protest, the agency noticed certain irregularities in the process unrelated to the protest that could have affected the outcome of the source selection. The agency then terminated the awarded contract for convenience. Your office dismissed the remainder of the May 17, 2007 protest pursuant to the agency's notice that the award had been terminated and corrective action was being taken by the agency.

**Instant solicitation**

In view of the exigent need for such equipment, the agency conducted a limited competition (actually completed prior to the termination of the contract from the earlier solicitation) between the awardee and the protester under FAR part 6.302-2 and 10 USC § 2304(c)(2). See enclosure (3).

ADSI and SCGP were given advance copies of the revised statement of work (SOW), the contract line items (CLINS), and the Navy's delivery requirements on Friday June 1, 2007, and asked to submit their prices not later than Monday June 4, 2007. See enclosures (4) and (5). Since the two offerors has just competed on virtually the same urgent requirement, this was not considered unduly burdensome.

The revised SOW specified what material was to be used in the preparation of the armor kits. Paragraph 2.4.1 of the SOW did not call out testing by ATC but did specify a 3/8 inch thick rolled homogenous armor (RHA), class II, IAW MIL-A-12560 with a welded-on exterior appliqué of 3/8 inch thick structural steel in accordance with ASTM A36. This type of armor has been tested by ATC. Paragraph 2.4.2 of the SOW specified requirements for transparent armor (window glass) and limited acceptable transparent armor to that tested by the ATC from vendors ADSI and Sierracin Corp. It does not set forth specific ballistic requirements since testing under the requirements previously specified had not been done at ATC. Both offerors submitted timely

proposals on June 4, 2007. However, revisions had been made to the solicitation itself which had not been provided in advance to the offerors. The revised solicitation included an additional requirement for tires, emphasized the possibility of price-based multiple awards, eliminated the need for technical proposals, and stated that this award would be to the lowest priced technically acceptable offer(s). Both offerors were orally advised on June 5 that each related group of CLINs would be examined because there was a potential for award of different CLINS to different offerors depending on low price. No names of potential competitors were mentioned or otherwise discussed.

This revised solicitation was not available until late on Tuesday, June 5, 2007. Both ADSI and SCGP were sent the revised solicitation on June 5 via email. The two emails containing the revised solicitation were sent within one minute of each other, at 6:08 and 6:09 PM. See enclosures (6) and (7). In order to permit the offerors at least some opportunity to consider the impact of the revisions on this very urgent armor requirement, both were given the opportunity to submit revised proposals until 1200 PDST June 6, 2007. Enclosures (8) and (9) are the final offers.

On June 7, 2007 the agency made award of CLINs 0001-0003, 0011, 0012, 0015, 0016, 0019, and 0020 in the amount of $843,122.06 to ADSI. SCGP was awarded CLINs 0004-0010, 0013, 0014, 0017, and 0018 in the amount of $988,000.00. Enclosures (10) and (11) are the awards to ADSI and SCGP. This protest followed on June 11, 2007. The protester did not request a debriefing regarding this award from the contracting officer or other officials at SCCC.

**Protest Allegations**

The protester protests the award of solicitation/contract N62473-07-C-4055. The agency suspects that this may be a typographical error on the part of the protester since it was awarded contract N62473-07-C-4055. SCGP was awarded N62473-07-C-4054 and presumably that is the intended target of this protest. Also, the protester refers to a prior solicitation N62473-07-R-2024. The agency is unaware of this solicitation which was also cited in the protester's May 17th protest. The agency believes that this is another typographical error and that the protester is referring to N62473-07-C-4024 which was originally awarded to SCGP *in toto* but terminated for convenience in order to re-solicit offers from ADSI and SCGP under a Justification and Approval for limited competition in accordance with FAR 6.302-2.

As it did in its May 17, 2007 protest to your office, ADSI alleges that it is the only qualified bidder. ADSI maintains that SGCP is not qualified because it has not previously supplied Add-on Armor CME kits, its armor has not been tested by ATC, and it is using ADSI proprietary solutions. In addition, SCGP may not have a facility security clearance or have cleared personnel. ADSI maintains the security clearance are necessary in order to have access to classified ballistic test results which in turn are necessary to meet the requirement in paragraph 2.3.2.3 that the transparent armor exceed the threat level of the opaque armor.

On the other hand the protester maintains that it is the only qualified commercial vendor of the products sought by the Navy by virtue of its past experience. The protester states that it has developed unique and proprietary solutions which only it can legally provide. The protester

avers throughout its protest that it is the best value to the government because of its extensive experience.

The protester also complains that the Navy's specifications are inadequate, and that requirements from the earlier specification should be read into the current SOW. The Navy deleted the specific requirement for ATC testing and does not set forth the ballistic requirements with particularity that the armor must meet. According to the protester the Navy specifications also leave too many welding decisions to the contractor.

The protester also alleges that the Navy gave SCGP an unfair competitive advantage in that they *may* have been provided with additional solicitation specifications before ADSI received them.

The protester complains that SCGP does not have the past performance credentials required in the prior solicitation.

The protester complains that SCGP does not have the experience to properly price the type of product and work sought by the solicitation.

The protester also maintains that the specifications require commonality and that to insure commonality across the services all work for armor kits should go to them.

The protester believes that SCGP may be in violation of FAR 52.227-2 by infringing on ADSI's alleged proprietary solutions.

**Discussion**

SCGP is a qualified offeror under a fixed price contract. The contracting officer has determined that SCGP is capable of performing its contract and the protester is essentially challenging the contracting officer's affirmative determination of responsibility. Under 21.5(c) of your protest regulations, your office does not consider challenges to the contracting officer's affirmative determination of responsibility except in very limited circumstances which the protester has not demonstrated are present. The exceptions are limited to the failure of the awardee to meet definitive responsibility criteria set forth in the solicitation or fraud or bad faith on the part of procurement officials. Mere disagreement with the agency's responsibility determination does not demonstrate that an exception applies. Ionsep Corp. Inc., B-255122, 94-1 CPD ¶ 97 (Feb. 10, 1994). The protester does not allege that SCGP failed to meet any definitive responsibility criterion contained in this solicitation. The solicitation does not require an offeror to have prime contracting experience, although SCGP does have such experience. The protest itself acknowledges that the awardee gained relevant experience as a subcontractor to the protester. The solicitation also does not require that the prime contractor's fabricated solution have undergone testing by ATC, although the materials called for in the solicitation have been tested by ATC. There is also no specific contract requirement for the offeror to have either a facility security clearance or cleared employees. That the need for such is implied by paragraph 2.3.2.3 is simply not supported by the plain language of the paragraph which merely requires the

transparent armor to exceed the threat level of the opaque armor. Threat levels are not classified and it is not necessary for either contractor to have access to ATC classified data in order to determine the threat level of the transparent armor included in their offer. The threat level information is readily available.

As to the use of ADSI's alleged proprietary designs, the solicitation again does not contain a relevant definitive responsibility criterion. The protester has an ongoing legal dispute with SCGP apparently stemming from performance under the TACOM contracts cited above. The protester has made a series of allegations regarding violations of private non-disclosure agreements, patent rights, patent infringement, conversion, and criminal conduct. These do not provide any basis to support a protest to your office. To the contrary, they clearly establish that your office is not the proper venue to litigate this protester's objections. Neither your office nor the Navy is in a position to adjudicate this dispute between the protester and SCGP. The Navy has no particular knowledge as to what may in fact be proprietary to the protester, SCGP, or the Government for that matter. Your office has previously addressed these types of issues by holding that these are private matters between the corporate parties or addressable in the courts and not subject to resolution through the protest process. See Superior Optical Labs Inc., B-294662 (December 9, 2004); United HealthServ Inc., B-232640, 89-1 CPD ¶ 43 (January 18, 1989); Patton Electric Co., B-194565, 79-2 CPD ¶ 154 (August 27, 1979); Ling Electronics, B-194590, 72-2 CPD ¶ 46 (July 20, 1979).

The protester's allegation that only it is a qualified bidder for these products is the other side of the same affirmative responsibility coin. This solicitation was awarded on a low price, technically acceptable (LPTA) basis as set forth in the solicitation. Both awardees agreed to provide the Navy with the products and services requested in the solicitation and within the mandatory time frame. The contracting officer determined that both offerors were capable of performing. The decision was then based on price and each offeror received a contract for the line items for which it was the low offeror. That the protester may have superior technical qualifications, even if true, is completely irrelevant. That the protestor may dispute the right of SCGP to provide the Navy with any of the items because of a dispute over proprietary rights is not a bid protest function.

The protester presents this proprietary rights argument in several guises and it permeates the protest. It is the only qualified commercial vendor because it is the only one with experience. And the reason it is the only one with experience is that it has proprietary rights in the process so no one else can legally engage in the sale of the armor kits. According to the protester it is the best value because it developed proprietary systems which the government can only legally obtain from ADSI. However, the protester knows that SCGP has experience with the armor and ADSI itself provided that experience. And the protester knows that there is an ongoing dispute over those proprietary rights it alleges it owns. In any event the determination of those rights is not a bid protest function.

The protester also challenges the adequacy of the Navy's specifications, and argues that provisions from earlier solicitations should be read into the current solicitation. The protester objects to the Navy deleting the specific requirement for ATC testing, no longer setting forth the ballistic test the contractor must meet, and leaving too many welding decisions to the contractor.

However, all these changes are in the revised SOW and the protester's challenge to the SOW changes is untimely. The protester was provided with the changes in the SOW on Friday, June 1, 2007. The protester did not object to the revisions to the SOW to either the agency or your office, even though they had several opportunities to do so before the ultimate closing date at noon on June 6, 2007. Instead the protester made a conscious choice to participate in the acquisition as is, and only raises such concerns regarding the changes to the SOW after the fact. While admittedly there was not a great deal of time, the protester was still obligated to raise the issue before the June 6 closing date. Two days has been held by your office to be sufficient time to file a protest in similar situations. See WareOnEarth Communications Inc., B-298408, 2006 CPD ¶ 107 (July 11, 2006); Concepts to Operations Inc., B-248606, 92-2 CPD ¶ 164 (September 10, 1992); R.T. Nelson Painting Services Inc., B-227953, 88-1 CPD ¶ 198 (Feb. 26, 1988).

Even if this were a timely raised issue it is not something your office would normally address, because it is the agency that has to live with the consequences of any misstatement of its requirements. Your office will examine specifications for ambiguities that adversely impact competition. However, in this case the competition was limited to the offerors known to have provided the armor in question and who participated in the earlier competition. Therefore, the goal of preserving the competitive system would not be enhanced in this case by examining the viability of the SOW. In any event the changes to the SOW do not create ambiguities or fail to state the Navy's minimum needs. The protester objects to the Navy not including the specific requirement for ATC testing but the Navy already knows that the material specified in the solicitation has been tested by ATC under other contracts. Therefore, a specific statement in the SOW serves no useful purpose. The ballistic testing set forth in the earlier SOW was actually an error, because offerors were required to prove that ATC had tested the material to those specific ballistic requirements and ATC had not done so for any company's products. Thus, it was impossible for offerors to comply with the requirement as written. The Navy reviewed its requirements and decided that it would accept the ATC testing results under whatever conditions that ATC had conducted the tests without reference to specific separate ballistic requirements. Since it decided to accept the ATC results "as is," it no longer served a useful purpose to include separate ballistic requirements in the SOW. Since the Navy specified products that had been tested by ATC, it was not necessary to refer to ATC testing regarding the opaque armor. As to leaving too many welding decisions to the individual contractor, the Navy is correctly more interested in performance results and less interested in specifying the contractor's manner of performance, the protester's opinion to the contrary notwithstanding.

The protester's allegation that the Navy may have provided SCGP with advance copies of the solicitation specifications is unsupported by the facts. Both parties were sent the revised SOW at the same time on Friday June 1, 2007. See enclosures (4) and (5). Both parties were sent the solicitation revisions at the same time on Tuesday evening June 5, 2007. See enclosures (6) and (7). Neither ADSI nor SCGP were provided advance information although SCGP as the awardee on the terminated contract did have the opportunity to review the Navy's equipment and performed under the contract until the stop work was issued.

The protester also complains that SCGP does not have the past performance credentials that were required under the prior solicitation. What the prior solicitation required in the manner

of past performance is irrelevant since the Navy did not include a requirement to submit past performance information in this solicitation, which was conducted under FAR 6.302-2 authority. There is no authority for requiring an agency to include the same requirements in every solicitation for the same or similar products, or for applying the prior contents of a modified or terminated solicitation to a current action at the whim of a competitor.

The protester next maintains that the awardee lacks the experience to price the contract. This is a fixed price contract and this argument again challenges the responsibility offeror. Your office has repeatedly refused to consider challenges to an agency's affirmative determination of responsibility in the absence of bad faith. There is neither an allegation of bad faith in this case nor evidence thereof in the protest. See 4 CFR §21.5(c); AllWorld Language Consultants, Inc., B-298831 (December 14, 2006).

Accepting the protester's position that they provide commonality, the protester does not allege that the awardee failed to meet or will fail to meet any 'commonality' requirement. Rather the protester recites its experience and pending patents. This appears to be a further effort to argue its technical superiority to the awardee and litigate its patent and proprietary rights issues before your office. To the extent that 'commonality' is a contract requirement, ensuring commonality is a matter of contract administration and under your precedents, not for consideration by your office. Sealift, Inc., B-298588 (October 13, 2006).

Finally, the protester's belief that SCGP may be in violation of FAR 52.227-2 by infringing on ADSI's alleged proprietary armor kit solutions is not a matter for review by your office. GAO is not the proper forum to litigate this type of dispute. 28 USC §1498 requires that challenges based on patent and copyright can only be brought in the Court of Federal Claims. Your office has previously addressed intellectual property challenges by dismissing the protest on this basis. See Ionsep Corp. Inc., B-255122, 94-1 CPD ¶ 97 (February 10, 1994).

**Conclusion**

For the reasons set forth above this protest should be dismissed in its entirety.

Respectfully submitted,

Arthur F. Thibodeau
Counsel
SCCC
Naval Facilities Engineering Command

Robert E. Little, Jr.
Associate Counsel
Headquarters, Naval Facilities Engineering Command

Enclosures; Electronic Reference:
1. ADSI Protest dated June 11, 2007; E1 ADSI Protest.pdf
2. Solicitation N62473-07-R-4054; E2 Solicitation N62473-07-R-4054.pdf

3. J&A dated June 4, 2007; E3 JA Armor 6-4-07.pdf
4. SOW email ADSI June 1, 2007; FW N62473-07-R-4054 Armor Kits.msg
5. SOW email SCGP June 1, 2007; FW N62473-07-R-4054 Armor Kits (1).msg
6. Solicitation email ADSI June 5, 2007; FW N62473-07-R-4054 Armor Kits (2).msg
7. Solicitation email SCGP June 5, 2007; FW N62473-07-R-4054 Armor Kits (3).msg
8. Final Offer ADSI 6/6/07; E8 ADSI Proposal N62473-07-R-4054 6-06-07.pdf
9. Final Offer SCGP 6/6/07; E9 SCGP Proposal N62473-07-R-4054 6-06-07.pdf
10. Award ADSI N62473-07-R-4054; E10 N62473-07-C-4055 ADSI.pdf
11. Award SCGP N62473-07-R-4055; E11 N62473-07-C-4054 SCGP.pdf

GAO
Accountability • Integrity • Reliability

United States Government Accountability Office
Washington, DC 20548

# FACSIMILE NOTICE

**Date:** July 6, 2007

Number of pages, including this cover sheet:

If transmission problems occur, please call 202-512-4788.
Our fax number is 202-512-9749.

**Re:** B-299867
American Defense Systems, Inc.

**From:** Nora Adkins
Staff Attorney

| Name | Firm/Agency | Phone | Fax |
|---|---|---|---|
| Thomas Cusack | American Defense Systems, Inc. | 516-390-5300 | 516-390-5308 |
| Robert Little, Esq. | Department of the Navy | 202-685-9120 | 202-685-1483 |

COMMENTS:

Attached is our dismissal.

Thank you,

Nora K. Adkins
GAO Staff Attorney

GAO
Accountability * Integrity * Reliability

Comptroller General
of the United States

United States Government Accountability Office
Washington, DC 20548

# Decision

**Matter of:** American Defense Systems, Inc.

**File:** B-299867

**Date:** July 6, 2007

**DECISION**

American Defense Systems, Inc. (ADSI) protests the award of a contract to Southern California Gold Products, Inc. (SCGP) by the Department of the Navy under request for proposals (RFP) No. N62473-07-R-4054, for 35 construction and material equipment armor solution kits (ASK) identified under 20 contract line items.

We dismiss the protest.

Prior to this protested procurement action, on May 8, 2007, SGCP received an award for ASKs under RFP No. N62473-07-R-4024, a competitive solicitation issued under commercial item procedures. ADSI protested the award complaining, among other issues, that SCGP's proposal was "nonresponsive" for not having tested its armor at the Aberdeen Test Center as required by that solicitation. This contract was terminated for convenience by the Navy on June 18 because of alleged irregularities in the procurement process that could have affected the source selection.[1] We therefore dismissed the protest. AR at 2.

Due to urgent and compelling circumstances, the RFP that is the subject of this protest was issued only to ADSI and SCGP, which had submitted proposals in response to the prior RFP. On June 1, prior to the actual issuance of the RFP, ADSI and SCGP were given notice of this limited competition via e-mail. The contracting officer's e-mail stated, "This is a commercial procurement. Due to the critical

---

[1] ADSI now questions the Navy's actions in terminating SCGP's contract, arguing that the termination may have been because SCGP was not capable of supplying all of the ASKs. This contention is both based on speculation and inference, leaving the protest essentially unsupported factually, see Computers Universal, Inc., B-293548, Apr. 9, 2004, 2004 CPD ¶ 78 at 4 n.7, and is a matter of contract administration not appropriate for our Office's review under its bid protest function. 4 C.F.R. § 21.5(a) (2007). Therefore, we will not consider this issue.

requirement the terms and conditions of the solicitation will be provided later." The solicitation's statement of work (SOW),[2] contract line items, inspection and acceptance, delivery information and desired and required time of delivery were attached to the e-mail. The e-mail indicated a deadline of Monday, June 4 at 4 p.m., Pacific Time, for receipt of proposals, but did not include the instructions to offerors or the evaluation criteria. Protest, Tab B, Notification E-mail.

On June 5, ADSI and SCGP received the full solicitation via e-mail with a deadline for receipt of proposals of June 6 at 12 p.m., Pacific Time. The newly issued RFP included the previously provided SOW, contract line items, inspection and acceptance, delivery information and desired and required time of delivery, and added instructions to offerors and evaluation sections. The instructions requested that offerors provide the necessary information on whether they were able to meet the required delivery schedule, but did not request offerors to submit technical proposals; only prices and certain administrative information was solicited. RFP at 19. The RFP's evaluation section notified offerors that award would be based on the lowest-priced, technically acceptable offer, and indicated that multiple awards were possible if that would result in the lowest cost to the government. RFP at 26.

The agency received proposals from ADSI and SCGP by the proposal deadline, and on June 7, 2007, made multiple awards to ADSI for 14 ASKs in the amount of $843,122.06 and to SCGP for 21 ASKs in the amount of $988,000. In accordance with the RFP's evaluation scheme and in the absence of any exceptions taken to the RFP requirements, awards were based on the low price offered for each contract line item. This protest followed.

ADSI first contends that the current SOW requirements are inadequate and inherently vague, that this solicitation is not for a "commercial item," and that the SOW requirements included in the prior RFP should be applied here. These contentions are untimely raised as they are based on alleged improprieties in the solicitation. Under our Bid Protest Regulations, a protest based on alleged improprieties in a solicitation must be filed prior to bid opening or the time established for receipt of proposals. 4 C.F.R. § 21.2(a)(1). ADSI did not protest any of these matters prior to the June 6 closing date and therefore these protest grounds are dismissed as untimely.

ADSI also asserts that it is the only qualified offeror that could receive an award because SCGP is not capable of performing to the SOW requirements, inasmuch as it has not previously supplied add-on armor kits, its armor has not been tested, and it is using ADSI's proprietary solutions.

---

[2] The SOW for this RFP, which stated the minimum technical requirements to produce the armor solution, was very similar to the previous RFP's SOW. One notable difference concerned armor testing requirements.

Where, as here, award under an RFP is based on price, no technical proposals are solicited, and the offeror does not take exception to the RFP requirements, challenges to the offeror's acceptability or compliance with the RFP requirements are matters that concern whether the offeror is responsible because they relate to whether the offeror is capable of performing the contract to which it has committed by submitting its offer.[3] See Action Serv. Corp., B 246413; B-246413.2, March 9, 1992, 92-1 CPD ¶ 267 at 4. We generally will not review a protest against affirmative determinations of responsibility, which are largely committed to the contracting officer's discretion. 4 C.F.R. § 21.5(c). The exceptions to this rule are protests that allege that definitive responsibility criteria in the solicitation were not met and those that identify evidence raising serious concerns that, in reaching a particular responsibility determination, the contracting officer unreasonably failed to consider available relevant information or otherwise violated statute or regulation. Id. Neither exception applies here.

We first note that ADSI has not alleged that the contracting officer unreasonably failed to consider available relevant information pertaining to SCGP's responsibility. To the contrary, the record indicates that the contracting officer was aware of the dispute between ADSI and SCGP as well as SCGP's successful performance under a similar contract, and determined that ADSI was capable of performing the contract protested here.[4]

Moreover, contrary to ADSI's contentions, this RFP did not contain definitive responsibility criteria. Definitive responsibility criteria are specific and objective standards established by an agency for a particular procurement to measure the offeror's ability to perform the contract. In effect, such criteria reflect the agency's judgment that an offeror's ability to perform in accordance with the specifications

---

[3] To the extent that ADSI argues that SCGP's proposal was technically unacceptable, or that ADSI's offered armor systems are superior to SCGP's because ADSI's armor has been appropriately tested and SCGP's has not, these arguments are irrelevant to the award under this RFP because technical proposals were not requested, relative technical acceptability was not an evaluation criterion, and SCGP did not take exception to the solicitation requirements; thus, price was award determinative factor if SCGP was determined to be responsible.

[4] ADSI questions the propriety of the previous contract awarded to SCGP for opaque armor (N62473-07-C-4014), which was referenced by the agency in arguing that SCGP was a responsible contractor. Our Bid Protest Regulations, 4 C.F.R. §§ 21.1(c)(4) and (f) (2007), require that a protest include a detailed statement of the legal and factual grounds for protest, and that the grounds stated be legally sufficient. A mere allegation of an improper agency evaluation, made "on information and belief," without any supporting explanation or documentation, does not satisfy the requirement that a protester provide a detailed statement of legal and factual grounds. Siebe Envtl. Controls, B-275999.2, Feb. 12, 1997, 97-1 CPD ¶ 70 at 2.

must be measured not only against the traditional and subjectively evaluated responsibility factors, such as adequate facilities and financial resources, but also against a more specific requirement, such as a specific number of years of particular specified experience, compliance with which can be measured objectively. PTR-Precision Technologies, Inc., B-243439, Aug. 1, 1991, 91-2 CPD ¶ 110 at 2. The specification requirements referenced by the protester here do not establish standards relating to an offeror's ability to perform the contract; rather, such specifications serve the sole purpose of describing the items offerors are to agree to supply if they are awarded the contract, and are not considered definitive responsibility criteria. Clamshell Bldgs., Inc., B-250520, Dec. 11, 1992, 92-2 CPD ¶ 408 at 2.

The protest is dismissed.[6]

Gary L. Kepplinger
General Counsel

---

[6] To the extent, ADSI asserts that it should receive documents relating to Contract Nos. N62473-07-C-4014 and N62473-07-R-4024, such documents are not considered relevant to the protest of the present award, and, if desired, should be requested from the agency under the Freedom of Information Act.